*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0317p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

　　　　*v.*

MALIK D. HARDIN,

　　　　　　　　*Defendant-Appellant.*

No. 06-6277

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 05-00105—Thomas A. Varlan, District Judge.

Argued: October 30, 2007

Decided and Filed: August 25, 2008

Before: BATCHELDER, MOORE, and COLE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** John E. Eldridge, ELDRIDGE & GAINES, Knoxville, Tennessee, for Appellant. David Charles Jennings, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** John E. Eldridge, ELDRIDGE & GAINES, Knoxville, Tennessee, for Appellant. David Charles Jennings, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. Malik D. Hardin, Ray Brook, New York, pro se.

　　　　MOORE, J., delivered the opinion of the court, in which COLE, J., joined. BATCHELDER, J. (pp. 19-34), delivered a separate opinion concurring in part and dissenting in part and dissenting from the judgment.

_____

### OPINION

_____

　　　　KAREN NELSON MOORE, Circuit Judge. This case poses a series of intriguing questions: first, to enter a residence to execute an arrest warrant, must a police officer have probable cause or only "reason to believe" that the suspect is inside the residence, and did the officers' knowledge in this case satisfy either standard? Second, does an apartment manager become an agent of the government when officers request that the manager enter an apartment to verify the presence of a suspect? Because we hold that the officers' knowledge was insufficient under either standard and that the apartment manager was acting as an agent of the government in this case, we **REVERSE** the district court's denial of Defendant-Appellant Malik D. Hardin's ("Hardin") motion to suppress,

1

**VACATE** Hardin's conviction, and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Facts

Hardin appeals his conviction following a two-day jury trial in June 2006.  The jury convicted Hardin of possession with intent to distribute five grams or more of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

For the most part, the facts in this case are not significantly disputed.  On March 28, 2005, Hardin was released from prison and put on federal supervised release.  In June 2005, a federal warrant for Hardin's arrest issued following a petition to revoke his supervised release.  Joint Appendix ("J.A.") at 125-26 (Gov't Resp. to Def.'s Sent. Mem. at 2).  On August 29, 2005, Officer Ed Kingsbury ("Kingsbury"), an investigator with the Knoxville Police Department, received a tip from a confidential informant ("CI") that Hardin might be staying with a girlfriend at the Applewood Apartment complex.  J.A. at 84 (Magistrate Judge's Report & Recommendation Re: Mot. to Suppress ("Mot. to Suppress R&R") at 3).  The CI also described the vehicle that he believed Hardin to be driving, but the CI could not identify which particular apartment he believed Hardin to be staying in, only its approximate area in the building.  *Id.*; *see also* J.A. at 160-63 (Hr'g Tr. at 18-21).

Along with Officer Jason Tarwater ("Tarwater"), Kingsbury went to the apartment building, where the officers spotted what they believed to be the described vehicle[1] near the apartment unit, number 48, that they believed the CI had described.  J.A. at 84 (Mot. to Suppress R&R at 3), 149-50 (Hr'g Tr. at 7-8).  The officers talked with the apartment manager, whom the government never produced and identified only as "Craig," who informed them that Hardin had not leased any apartment and that the manager had not seen him on the property.  J.A. at 84-85 (Mot. to Suppress R&R at 3-4), 168 (Hr'g Tr. at 26).  The apartment manager told them that a woman, Germaine Reynolds ("Reynolds"), had leased Apartment 48.  J.A. at 85 (Mot. to Suppress R&R at 4).  The government and Hardin stipulated that Hardin was an overnight guest of Reynolds, the lessee, and that "standing was not an issue."  J.A. at 58 (Mot. to Reveal Identity Mem. & Order at 2 n.1).

The officers advised the manager of Hardin's criminal history, namely a shootout with police officers following an armed-robbery incident in the mid-1990s, a conviction for which Hardin served ten years in prison.  J.A. at 169 (Hr'g Tr. at 27).  Kingsbury testified that the apartment manager was shocked and worried about Hardin's potential presence in the apartment complex, and Kingsbury told the manager that "we need to see if he is there" and that "[w]e *asked* him to go ahead and under a ruse check to see if a water leak was in the apartment to see if he was there."  J.A. at 151 (Hr'g Tr. at 9) (emphasis added).  Kingsbury unequivocally stated that "[w]ithout a doubt" the ruse "was my idea."  J.A. at 171-72. (Hr'g Tr. at 29-30).  At trial, Kingsbury testified that "[w]e *sent* the manager of the apartment to see if [Hardin] was there."  J.A. at 267 (Trial Tr. at 33) (emphasis added).

The officers watched on CCTV as the manager walked to Apartment 48 and entered it.  J.A. at 172-73 (Hr'g Tr. at 30-31).  Hardin testified that the manager simply entered the apartment, using a key, and called out "Maintenance."  J.A. at 221-22 (Hr'g Tr. at 79-80).  At that time, Hardin was in the back bedroom, talking on a cell phone to Reynolds.  *Id.*  Hardin asked her what to do, and she

---

[1] The officers never searched the vehicle nor did they determine that it belonged to Hardin.  J.A. at 286-87 (Trial Tr. at 52-53), 185-86 (Mot. to Suppress Hr'g Tr. at 43-44).

told him to ask what they wanted. J.A. at 222 (Hr'g Tr. at 80). Hardin stated that the manager "said there is a water leak upstairs in the upstairs apartment. Is it all right if I come in and check your bathroom?" and that he related this information to Reynolds. *Id.* In response, she stated "yes, I guess," and Hardin told the manager he could look at the bathroom. *Id.* After checking the bathroom, the manager stood in the hallway outside the bedroom, looked in, and asked Hardin if he had heard any water running. J.A. at 223 (Hr'g Tr. at 81). The apartment manager returned to the officers and told them that "the guy you are looking for is back in the back bedroom on the right laying on the bed talking on the cell phone." J.A. at 173 (Hr'g Tr. at 31).

Kingsbury testified that he felt they had probable cause at that point. J.A. at 174 (Hr'g Tr. at 32). Earlier in the hearing Kingsbury stated his belief that the CI's information was not sufficient to establish probable cause alone. J.A. at 163-64 (Hr'g Tr. at 21-22); *see also* J.A. at 46-47 (stating that the officers "based their decision that they had probable cause to believe [Hardin] was inside [] upon the apartment manager's verification") (Gov't Resp. to Def.'s Mot. to Reveal Identity of Informant at 1-2).

After the apartment manager verified Hardin's presence in Apartment 48, Kingsbury and Tarwater called for two more officers to join them in entering the apartment to arrest Hardin, whom they believed to be dangerous based on his prior conviction. The officers entered abruptly, screaming "police" and "get down on the ground." J.A. at 89 (Mot. to Suppress R&R at 8). They found Hardin sitting on a couch in the front room, and Kingsbury stated that Hardin cooperated in moving to the floor and allowing himself to be handcuffed. *Id.* Kingsbury testified that, as the other officers handcuffed Hardin, he searched the couch on which Hardin had been sitting and found a firearm underneath a cushion. *Id.* Another officer, Jared Turner, conducted a sweep of the apartment's other rooms, and when he entered the bedroom, "he saw a bed with a bedskirt" and "[i]t appeared to him as though someone might be under the bed, because of the way an area of the sham poked out." J.A. at 94 (Mot. to Suppress R&R at 13). Upon investigation, Turner discovered that the protrusion was a shoe box that contained two more firearms. *Id.* In addition to the three firearms, the officers recovered crack cocaine, marijuana, and approximately $2,000 in cash from Hardin's pockets. J.A. at 92 (Mot. to Suppress R&R at 11).

## B. Procedural History

On September 7, 2005, a Grand Jury indicted Hardin on three counts, J.A. at 12-13 (Indictment), and on January 23, 2006, Hardin filed a motion to suppress the physical evidence recovered from the apartment, J.A. at 23-29. Although the officers had a warrant for his arrest, Hardin contended that the officers lacked probable cause to believe that he was present in the apartment where he was staying as a guest.[2] The government argued that probable cause existed because the apartment manager, at the officers' request, entered the apartment and verified Hardin's presence. J.A. at 30-36 (Gov't Resp. to Mot. to Suppress).

On February 17, 2006, Hardin filed a motion to reveal the identity of the CI. J.A. at 40-45. The government filed a response to Hardin's motion to reveal the identity of the CI in which it argued that the CI's identity was "irrelevant" because probable cause to enter the apartment was

---

[2] Hardin also argued that the officers' protective sweep, which uncovered two of the three firearms in this case, exceeded the permissible scope for such sweeps under *Maryland v. Buie*, 494 U.S. 325 (1990). On appeal, Hardin filed two supplemental briefs *pro se*, claiming that one of the three counts of which he was convicted was duplicitous and that the district court erred in failing to give a cautionary instruction regarding the trial testimony of DEA Agent Lewis, the government's expert witness on drug-trafficking matters, insofar as it pertained to the "ultimate conclusion" of Hardin's state of mind. Because of our holding that the district court erred in denying Hardin's motion to suppress the evidence in this case, we do not reach these additional claims.

"based upon the apartment manager's verification that the defendant was inside." J.A. at 46-47 (Gov't Resp. to Def.'s Mot. to Reveal Identity of Informant at 1-2).

On March 1, 2006, a magistrate judge heard oral argument on Hardin's motion to reveal the identity of the CI. During the hearing, at which no evidence was presented, the magistrate judge questioned Hardin's argument that the apartment manager was acting as an agent or instrument of the government when he entered Apartment 48 to determine whether Hardin was present. J.A. at 132-33 (Mot. to Reveal Identity Hr'g Tr. at 4-5). On March 9, 2006, the magistrate judge issued a Memorandum and Order denying Hardin's motion to reveal the CI's identity. The magistrate judge concluded that the apartment manager was not acting as an agent or instrument of the government because the magistrate judge held that Tennessee negligence law imposes upon apartment managers "a legal duty to all residents of the apartment community to exercise reasonable care in preventing harm to tenants resulting from third-party crimes on the premises." J.A. at 65 (Mot. to Reveal Identity Mem. & Order at 9) (citing *Tedder v. Raskin*, 728 S.W.2d 343, 347-48 (Tenn. Ct. App. 1987)).

On March 17, 2006, the magistrate judge held a hearing on Hardin's motion to suppress the physical evidence. On March 29, 2006, the magistrate judge issued a Report and Recommendation denying Hardin's motion to suppress. After noting Hardin's argument that the apartment manager was acting as an agent of the government, the magistrate judge observed that he had already resolved this issue against Hardin following the earlier, non-evidentiary hearing. J.A. at 96 & n.1 (Mot. to Suppress R&R at 15).

On May 3, 2006, the district court issued a Memorandum and Order overruling Hardin's objections to the magistrate judge's order denying Hardin's motion to reveal the identity of the CI. The district court noted Hardin's objection to the magistrate judge's ruling, in the absence of testimony, that the apartment manager was not acting as an agent of the government, but the court agreed with the magistrate judge that the apartment manager, "upon learning from law enforcement that the defendant may be in one of the apartments, had an independent duty to investigate further and confirm whether, in fact, [Hardin] was in the apartment." J.A. at 112-13 (Mem. & Order at 2-3).

On May 25, 2006, the district court issued a Memorandum and Order overruling Hardin's objections to the magistrate judge's Report and Recommendation and denied Hardin's motion to suppress. The district court stated that "the Court again agrees [with the magistrate judge] that the apartment manager had an independent business duty to enter the apartment and confirm whether the defendant was in the apartment." J.A. at 115 (Mem. & Order at 2).

After a two-day jury trial in June 2006, Hardin was convicted of all counts. On September 26, 2006, the district court sentenced Hardin to 360 months in prison and eight years of supervised release and imposed a $300 Special Assessment. Hardin timely filed a notice of appeal.

## II. ANALYSIS

### A. Whether Probable Cause or Reason to Believe is the Correct Standard Governing When Officers May Enter a Residence to Execute an Arrest Warrant

The first question presented by this case concerns the proper standard for evaluating the quantum of proof required for police officers to enter a residence to execute an arrest warrant. In *Payton v. New York*, 445 U.S. 573 (1980), the Supreme Court stated that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe* the suspect is within." *Id.* at 603 (emphasis added). Earlier in the opinion, the Court noted that the case involved no contention that "the police lacked *probable cause* to believe that the suspect was at home when they entered." *Id.* at 583 (emphasis added). In dissent, Justice White stated his understanding that "under today's decision, the officers

apparently need an extra increment of *probable cause* when executing the arrest warrant, namely, grounds to believe that the suspect is within the dwelling." *Id.* at 616 n.13 (White, J., dissenting) (emphasis added). Given that the officers did *not* have an arrest warrant in *Payton*, the Supreme Court did not elaborate on the quantum of proof necessary for officers to enter a residence to execute an arrest warrant, as the Court simply reversed the judgment against the defendant in the case after noting the absence of an arrest warrant. *Id.* at 603.

The district court analyzed Hardin's motion to suppress using a probable-cause standard, but on appeal the government argued in its brief that an intervening decision from our court, *United States v. Pruitt*, 458 F.3d 477 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1814 (2007), controls this case and commands a different standard. In particular, the two-judge majority in *Pruitt* stated that "a lesser reasonable belief standard, and not probable cause, is sufficient to allow officers to enter a residence to enforce an arrest warrant." *Id.* at 482. In response to the government's argument, Hardin contended in his Reply Brief that the *Pruitt* panel had overlooked our prior decision in *United States v. Jones*, 641 F.2d 425 (6th Cir. 1981). Reply Br. at 3-4. In *Jones*, observing that "[i]t is . . . fundamental that government officials cannot invade the privacy of one's home without *probable cause* for the entry," we summarized *Payton* as holding that "an arrest warrant can authorize entry into a dwelling only where the officials executing the warrant have *reasonable or probable cause* to believe the person named in the warrant is within." *Id.* at 428 (emphases added).

At first glance, *Jones* and *Pruitt* appear in conflict on this issue, in which case our circuit's rule that "[a] panel of this Court cannot overrule the decision of another panel," *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir.1985), would mean that our prior holding in *Jones* governs this case, notwithstanding the later view expressed by the majority in *Pruitt*. Indeed, at oral argument the government conceded that *Jones*, as the earlier case in our circuit, was binding and had settled this issue. Upon more careful review, however, we conclude that *Jones* does not control this case because *Jones* involved a distinct factual scenario and because the language in our *Jones* opinion is dicta. Applying the same careful review to our opinion in *Pruitt*, we conclude that *Pruitt* does not control this case either because the language in *Pruitt* purporting to adopt a "lesser reasonable belief standard" was not necessary to the determination of the issue on appeal and is therefore dicta. *See United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003) ("[T]his holding might be considered dicta in that it was not necessary to the determination of the issue on appeal."). We address *Jones* first and then *Pruitt*.

### 1. *Jones* Does Not Control this Case

In *Jones*, we considered the admissibility of evidence against a person *not* named in an arrest warrant; the arrest warrant was for the defendant's brother. *Jones*, 641 F.2d at 426-27. In *Payton*, in contrast, the officers were seeking to and did arrest Payton.[3] The Court's statement, therefore, that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe* the suspect is within" pertained to the Fourth Amendment rights of a person named in arrest warrant. *Payton*, 445 U.S. at 603. Indeed, in *Payton* the Court specifically observed that its opinion did not address "the authority of the police, without either a search warrant or arrest warrant, to enter a third party's home to arrest a suspect." *Id.* at 583.

---

[3] In *Payton*, "officers had assembled evidence sufficient to establish probable cause that [Payton] had murdered the manager of a gas station," and the Court also accepted that the officers had "probable cause to believe that [Payton] was at [his] home when they entered." *Payton*, 445 U.S. at 576, 583. Nonetheless, the officers had no warrant of any kind when they entered Payton's home, arrested him, and seized evidence; instead, they relied on "New York statutes that authorize[d] police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest." *Id.* at 574. The Court concluded that such statutes were unconstitutional. *Id.* at 576.

Although our opinion in *Jones* cited *Payton* and summarized *Payton*'s holding—supplying the language in *Jones* that Hardin relies upon as establishing that *Payton*'s "reason to believe" standard is equivalent to a probable-cause standard—*Jones* clearly involved a different factual situation than *Payton*. We noted as much in *Jones*, observing that *Payton* did not address the requirements when the "entry is to the premises of a third person" who then challenges the evidence seized in the search. *Jones*, 641 F.2d at 428 n.3. Citing our decision in *United States v. McKinney*, 379 F.2d 259 (6th Cir. 1967), we stated that "an arrest warrant and probable cause is sufficient" in such circumstances. *Jones*, 641 F.2d at 428 n.3. Shortly after our decision in *Jones*, however, the Supreme Court addressed this exact question in *Steagald v. United States*, 451 U.S. 204 (1981), and held that *more* was required to protect persons not named in an arrest warrant when officers seize evidence during their intrusion into a residence at which the persons enjoyed a reasonable expectation of privacy.

The Court in *Steagald* explained that "the narrow issue before us is whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests *of persons not named in the warrant*, when their homes are searched without their consent and in the absence of exigent circumstances." *Steagald*, 451 U.S. at 212 (emphasis added). The Court held that "a search warrant must be obtained absent exigent circumstances or consent" for evidence to be admissible against the person not named in the warrant. *Id.* at 205-06. The Court noted that the issue involved a conflict among the circuits and specifically cited our decision in *McKinney* as one "adopting the contrary view that a search warrant is not required." *Id.* at 207 n.3. The Court's opinion in *Steagald*, therefore, overruled our opinions in *McKinney* and *Jones* as to their holdings concerning the requirements for the admissibility of evidence against a person *not* named in an arrest warrant when officers enter a dwelling to execute the arrest warrant.

In light of *Steagald*, our opinion in *Jones* does not control this case. Hardin correctly notes that portions of *Jones* refer to a need for officers to have probable cause to believe the person named in arrest warrant is within a dwelling, but for the most part, those portions of *Jones* do not survive *Steagald* because those references to probable cause appeared within our analysis applying the standard (an arrest warrant plus probable cause) that the Supreme Court in *Steagald* rejected in favor of requiring a search warrant. Our other references in *Jones* to probable cause are mere dicta. We introduced our analysis in *Jones* by referring to the "fundamental" principle "that government officials cannot invade the privacy one's home without probable cause for the entry" and summarized the Court's holding in *Payton* by using the term "probable cause." *Jones*, 641 F.2d at 428. Our summary of *Payton*, however, was not essential to our resolution of a case involving distinct facts and a different question of law, and that summary is therefore dicta. *Bridewell v. Cincinnati Reds*, 155 F.3d 828, 831 (6th Cir. 1998) ("The country club's ability to satisfy the receipts test in [the statute] was not necessary to the holding in *Brock* [*v. Louvers & Dampers, Inc.*, 817 F.2d 1255 (6th Cir. 1987)], which means that the part of the opinion discussing the receipts test is dicta.").

### 2. *Pruitt* Does Not Control this Case

Having dispensed with Hardin's argument that *Jones* controls and establishes that *Payton*'s "reason to believe" standard is equivalent to probable cause, we now examine the government's contention that *Pruitt* has definitively settled this issue. We conclude that *Pruitt* has not answered this question and that language in our *Pruitt* opinion purporting to adopt "a lesser reasonable belief standard" is merely dicta.

In *Pruitt*, the defendant and the government disputed the correct interpretation of *Payton*'s "reason to believe" language and noted that a circuit split existed regarding the meaning of that language. *Pruitt*, 458 F.3d at 482. The defendant in *Pruitt* argued in support of the Ninth Circuit's decision in *United States v. Gorman*, 314 F.3d 1105 (9th Cir. 2002), which "ruled that probable

cause was required to support the reasonable belief that the subject of an arrest warrant was in a third-party's residence." *Pruitt*, 458 F.3d at 482 (citing *Gorman*, 314 F.3d at 1111-15). In response, the government argued that "a majority of the circuits that have ruled on the issue have determined that a lesser reasonable belief standard, and not probable cause, is sufficient to allow officers to enter a residence to enforce an arrest warrant, and that the officers here had adequate information in this case to meet this standard." *Id.* The two-judge majority "agree[d]" and proceeded to explain why the Supreme Court's "reason to believe" language in *Payton* should be understood as a standard lower than probable cause. *Id.* at 482-85. The majority then simply affirmed the district court's denial of the defendant's motion to suppress.

Judge Clay concurred in the judgment, but his opinion disagreed with the majority's conclusion that the Supreme Court had intended to establish, without any elaboration, a new standard of "reason to believe" in *Payton*. Judge Clay argued that "the 'reason to believe' standard under *Payton* . . . is the functional equivalent of 'probable cause' and not some lesser standard." *Id.* at 485 (Clay, J., concurring). Most importantly, however, Judge Clay highlighted that resolution of this dispute was unnecessary to the outcome of the case: reviewing the officers' evidence demonstrated that "the officers in the instant case had probable cause to believe Defendant was inside [the residence] when they entered." *Id.* at 491 (Clay, J., concurring). Although the majority opinion contained responses to certain other points made in Judge Clay's concurring opinion, *see id.* at 483-84, the majority opinion did not disagree with Judge Clay's assertion that the officers had satisfied the probable-cause standard.[4] Indeed, nowhere did the majority state that the officers lacked probable cause to believe that the defendant was inside the residence when they entered. It is easy to understand the majority's silence: the officers in *Pruitt* clearly had a great deal of evidence establishing probable cause to believe that the defendant was inside the residence when they entered.

If the officers in *Pruitt* had evidence sufficient to satisfy *either* a standard of probable cause or a lesser reason-to-believe standard, then selecting one standard or the other would "not [be] necessary to the determination of the issue on appeal," which was whether the officers violated the defendant's Fourth Amendment rights. *Swanson*, 341 F.3d at 530; *see also* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1256 (2006) ("A dictum is an assertion in a court's opinion of a proposition of law which does not explain why the court's judgment goes in favor of the winner."). The preference of a particular standard would therefore be dicta. Indeed, two of our sister circuits have recognized this point and, in similar cases in which the officers' knowledge satisfied *both* standards, the Third and Seventh Circuits simply affirmed the judgments without purporting to adopt one standard or the other. *See Covington v. Smith*, 259 F. App'x 871, 874 (7th Cir. 2008) (unpublished) ("We need not choose a side in this split because, again, under either standard the officers here were sufficiently certain that [the defendant] was present at the time of the search."); *United States v. Veal*, 453 F.3d 164, 167 n.3 (3rd Cir. 2006) ("As we conclude that the probable cause standard was met, we need not determine whether a possibly lower standard of reasonable belief should be applied here.").

Considering the facts in *Pruitt*, it is clear that the officers had probable cause to believe that the defendant was inside the residence when they entered, and therefore the majority's conclusion that *Payton* established "a lesser reasonable belief standard" was merely dicta. In *Pruitt*, the defendant failed to report to his parole officer in July 2004 and thereby became a fugitive from

---

[4] In asserting that "the *Pruitt* majority expressly rejected the concurring judge's argument," Dis. Op. at 30, our dissenting colleague misleadingly characterizes the majority opinion in *Pruitt*. The language from *Pruitt* quoted in the dissent pertains only to the *Pruitt* majority's disagreement with Judge Clay's argument that the Ninth Circuit's opinion in *Gorman* correctly interpreted "reason to believe" as the functional equivalent of probable cause. The majority in *Pruitt* did *not* expressly reject or anywhere consider Judge Clay's argument that the officers had probable cause to believe the suspect was inside the residence, eliminating the need to select the lower standard.

justice, with an arrest warrant issuing for him after law-enforcement officers were unable to find him at his listed address. *Id.* at 478. In August 2004, an anonymous female caller contacted the defendant's parole officer and told the parole officer that the defendant was residing at a specific address in Lorain, Ohio. The parole officer believed the caller to be the ex-girlfriend of the defendant, and "[t]he caller told [the parole officer] that she had seen [the defendant] at the [specific] address within the past few hours, and that [the defendant] was in possession of drugs and a firearm." *Id.* at 478-79. After the parole officer reported the tip to area police officers, the police officers began surveillance of the address. *Id.* Shortly thereafter, the officers observed a man knock at and enter the home; "the man exited the home a few minutes later, and sped away from the scene, prompting the officers to conduct a traffic stop." *Id.* at 479. The driver "produced a driver's license and recited a social security number." *Id.* After the officers showed the driver a photograph of the defendant, the driver identified the defendant as "Meaty," which the officers knew to be the defendant's street name, and the driver "stated that 'Meaty' was inside the residence, and that 'Meaty' had refused to sell him crack cocaine on credit." *Id.*

Such information clearly is sufficient to establish probable cause to believe that the defendant was present inside the residence. Two witnesses reported the defendant's very recent presence at the address, and, after the officers watch one of the witnesses enter and exit the residence, that witness stated he had just seen the defendant inside, identifying the defendant using his street name. Indeed, the officers in *Pruitt* had sufficient confidence in this information that "[a]fter receiving the information from [the driver], the officers went to the Lorain County Municipal Court to seek a search warrant" for the specified address in Lorain. *Id.* This information also convinced a prosecutor and a municipal court judge that probable cause existed, as the officers successfully obtained a search warrant and then entered the residence. *Id.* Due to several procedural errors, however, the district court concluded the search warrant was invalid: the detective forgot to add *any* information to the affidavit accompanying the warrant, and although the detective "recited the factual basis for the search warrant under oath [in municipal court], however, no transcript of his sworn statement was prepared." *Id.* at 479, 480.

We affirmed the district court's ruling that the search warrant was invalid, stating that "the officers could not have had a good faith belief that the warrant was valid because the warrant was obtained with a 'bare bones' affidavit, and no transcript of [the detective's] sworn statement was recorded by the Court." *Id.* at 480-81. In *Pruitt*, the government therefore relied on the arrest warrant only because procedural errors had invalidated the search warrant that the officers had obtained, but the government's evidence regarding the quantum of proof showing the likelihood that the defendant was inside the residence was the exact same evidence the officers had used in obtaining a search warrant. *See id.* at 483 (holding that the officers had sufficient evidence to believe that the defendant was inside the residence to execute the arrest warrant because the officers "relied on the anonymous tip given to [the defendant's] parole officer, [the driver's] identification of [the defendant] as 'Meaty' in a photograph, and his assertion that 'Meaty' was in the residence at that time selling drugs"). At no point did the majority in *Pruitt* suggest that officers had failed to demonstrate probable cause for the issuance of the search warrant; acknowledging the government's argument that the detective had merely "fail[ed] . . . to follow the correct procedure" and that the searching officers "relied on the warrant in good faith," the majority reasoned that "such a bare bones affidavit cannot support a reasonable belief on the part of law enforcement officials that a warrant is valid." *Id.* at 480-81. Had the above information failed to satisfy a probable-cause standard, the majority could have avoided analyzing whether the officers relied on the warrant in good faith; that is, the majority could have concluded that, even if the officers had properly prepared a complete affidavit and given sworn, recorded testimony, their evidence did not establish probable cause.

In sum, careful review of the facts in *Pruitt* demonstrates that the officers in that case had assembled evidence sufficient to satisfy *both* a probable-cause standard *and* a reason-to-believe

standard. The majority's statements in *Pruitt* "holding" that *Payton* established a lesser reasonable-belief standard were unnecessary to the outcome of the case, and when "the facts of the instant case do not require resolution of the question" any statement regarding the issue is simply dicta. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 n.4 (6th Cir. 2006); *see also Warshak v. United States*, 532 F.3d 521, 525, 528 (6th Cir. 2008) (en banc) (stating that "[t]he Constitution does not extend the 'judicial Power' to any legal question, wherever and however presented, but only to those legal questions presented in 'Cases' and 'Controversies,'" noting that "[c]oncerns about the premature resolution of legal disputes have particular resonance in the context of Fourth Amendment disputes," and explaining that courts "reach[] case-by-case determinations that turn on the concrete, not the general, and offering incremental, not sweeping, pronouncements of law").[5]

Having concluded that neither *Jones* nor *Pruitt* binds us in interpreting the meaning of *Payton*'s "reason to believe" language, we explain below that this case, too, does not require that we adopt one standard or the other to evaluate the district court's ruling on Hardin's motion to suppress.[6] That is, even assuming that a lesser reasonable-belief standard applies, the officers in this

---

[5] Our dissenting colleague levels the accusations that we have rendered the majority opinion in *Pruitt* "all dicta and no holding" and that our reading of *Pruitt* permitted the concurring opinion to "usurp[] the *Pruitt* majority's ability to make this decision and state a holding." Dis. Op. at 30 & n.5. The dissent also contends that because "the *Pruitt* court considered arguments on the law, stated the law for this Circuit, applied the facts, and rendered a decision based on that law and those facts" that "[i]n every case but this one, that would be a 'holding.'" Dis. Op. at 29.

The dissent's views are simply wrong. As explained in the quotation from our *en banc* decision in *Warshak*, we are *not* empowered to decide "any legal question, wherever and however presented, but only [] those legal questions presented in 'Cases' and 'Controversies.'" *Warshak*, 532 F.3d at 525. To have rendered a binding holding, the "arguments on the law" considered and the proposition of law "stated" by the *Pruitt* majority must have been *necessary* to the outcome of the *case*, not merely to the outcome of a debate regarding an abstract legal question. For that reason, the dissent is wrong to claim that the *Pruitt* concurrence "usurped the *Pruitt* majority's *ability* to make this decision and state a holding," Dis. Op. at 30 n.5 (emphasis added), because the *Pruitt* majority *never* had any ability to settle abstract legal disputes when the outcome of the case did not require resolving the abstract legal question.

Finally, the dissent's suggestion that our reading of *Pruitt* has removed any holding from the case, potentially rendering it advisory, is absurd. As the dissent recognizes, a holding is "a principle drawn from" a legal opinion, Dis. Op. at 29 (quoting Black's Law Dictionary (8th ed. 2004)), and the principle drawn from *Pruitt* is that the officers in that case had information sufficient to believe that Pruitt was inside the residence when they entered to execute the arrest warrant naming him such that the district court properly denied Pruitt's motion to suppress. Although the dissent claims that our opinion, by carefully considering whether a statement in a prior case regarding a legal issue is a holding or dictum, "sets a troublesome precedent," Dis. Op. at 19, we believe that the far more troubling practice is purporting to establish "holdings" supposedly resolving legal questions in cases that do not require that the questions be resolved.

[6] Although we recognize that our statements on this matter are dicta, we nonetheless explain briefly why we believe that probable cause is the correct standard and that the Supreme Court in *Payton* did not intend to create, without explanation or elaboration, an entirely new standard of "reason to believe." Several reasons support this conclusion. First, the Court in *Payton* noted the case involved no dispute that the officers had "*probable cause* to believe that the suspect was at home when they entered." *Payton*, 445 U.S. at 583 (emphasis added). Second, Justice White, in his dissenting opinion in *Payton*, likewise understood the Court as having adopted a standard requiring officers to have an arrest warrant plus probable cause to believe the suspect was inside. *Id.* at 616 n.13 (stating that "under today's decision, the officers apparently need an extra increment of *probable cause* when executing the arrest warrant, namely, grounds to believe that the suspect is within the dwelling") (emphasis added) (White, J., dissenting). Third, we agree with Judge Clay that the Supreme Court's tendency in other opinions to explain or define the term "probable cause" using "grammatical analogue[s]" like "reasonable ground for belief" suggests that *Payton*'s use of the phrase "reason to believe" expressed a standard equivalent to probable cause. *Pruitt*, 458 F.3d at 490 (Clay, J., concurring) (citing and quoting *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003), *Illinois v. Gates*, 462 U.S. 213, 231 (1983), and *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). Fourth, in *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court considered whether officers executing an arrest warrant in a residence, pursuant to *Payton*, could perform an additional "protective sweep" of the residence. *Buie*, 494 U.S. at 330. In the course of its analysis, the Court explained that "[p]ossessing an arrest warrant and *probable cause* to believe Buie was in his home, the officers were entitled to enter and to search anywhere in the house in which *Buie* might be found." *Id.* at 332-33 (emphasis added). Had the Court truly intended the "reason to believe" language in *Payton* to set forth a new, lesser standard, surely the Court in *Buie* would have explained that the officers were entitled to be inside Buie's residence on the basis of an arrest warrant and a "reasonable belief" as to Buie's presence, but the Court used the term "probable cause" instead.

case did not have sufficient evidence to form a reasonable belief that Hardin was present in the apartment.

**B.   The District Court Erred in Finding that the Officers had Sufficient Evidence to Believe that Hardin was Present in Apartment 48**

### 1.  Standard of Review

"In considering a district court's denial of a motion to suppress, we review its conclusions of law and application of the law to the facts, such as its finding of probable cause, de novo." *United States v. Kincaide*, 145 F.3d 771, 779 (6th Cir. 1998). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994). Further, in reviewing the denial of the motion, we may consider trial evidence in addition to the evidence admitted at the suppression hearing. *United States v. Brown*, 66 F.3d 124, 126 (6th Cir. 1995); *United States v. Perkins*, 994 F.2d 1184, 1188 (6th Cir. 1993) (stating that we have "held generally that [we are] 'not restricted to considering evidence offered during the hearing on the motion to suppress'" and that we "may consider evidence offered during the trial of a case as it may bear on the question of probable cause") (quoting *United States v. McKinney*, 379 F.2d 259, 264 (6th Cir. 1967)).

### 2.  Analysis

On appeal, the government contends that several grounds support affirming the district court's denial of Hardin's motion to suppress. These grounds include: (a) that the apartment manager provided reason to believe and/or probable cause to believe that Hardin was inside Apartment 48 and that the manager was not acting as an agent of the government; (b) that the information provided by the CI alone established reason to believe and/or probable cause to believe that Hardin was inside the apartment; and (c) that, even if the apartment manager were acting as an agent of the government, the manager's search was valid due to consent. We find fault with each of these arguments, which we address in turn.

#### a.  Was the Apartment Manager Acting as an Agent of the Government?

The district court denied Hardin's motion to suppress because it rejected Hardin's argument that "the apartment manager's entry into the apartment was police action and therefore the issue of whether the officers had probable cause must be based on the informant's tip alone." J.A. at 115 (Mot. to Suppress Mem. & Order at 2). The district court concluded that the manager was not acting as an agent of the government because it found that "the apartment manager had an independent business duty to enter the apartment and confirm whether the defendant was in the apartment." *Id.* After reviewing the case law and the evidence in this case, we hold that the district court erred in concluding that the apartment manager was not acting as an agent of the government.

Although the nature of the apartment manager's actions was a crucial issue in this case, the magistrate judge essentially resolved the issue in the Memorandum and Order denying Hardin's motion to reveal the identity of the CI, an early stage in the case and prior to hearing any evidence

---

We recognize, as did Judge Clay, that a majority of circuits have concluded otherwise. *Pruitt*, 458 F.3d at 489-90 (Clay, J., concurring). Nonetheless, we do not believe that the Court would have created an entirely new standard without explanation or elaboration. Further, given that Court has treated phrases such as "reasonable ground for belief" as *defining* probable cause, *see Pringle*, 540 U.S. at 800 ("We have stated, however, that '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt' . . . .'") (alteration in original) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)), and that the Court in *Buie* even stated the *Payton* standard using the term "probable cause," we believe that the most sensible interpretation of *Payton*'s "reason to believe" language is the view that "reason to believe" is a functional equivalent of probable cause.

or testimony on the matter. In the magistrate judge's Report and Recommendation regarding Hardin's motion to suppress, the magistrate judge referred in a footnote to the prior order determining that the apartment manager was not an agent of the government, adding briefly that the officers' testimony at the suppression hearing about the apartment manager's reaction upon learning of Hardin's criminal record supported the prior finding that the manager had an independent business motivation for entering the apartment. J.A. at 96 (Mot. to Suppress R&R at 15 n.1). Likewise, the district court summarized and relied upon the magistrate judge's initial conclusion in overruling Hardin's objections to both of the magistrate judge's reports. J.A. at 112-13 (Mem. & Order Re: Mot. to Reveal Identity); J.A. at 115 (Mem. & Order Re: Mot. to Suppress).

The magistrate judge's conclusion that the apartment manager was not acting as an agent of the government misconstrued cases from both federal and state courts. The magistrate judge concluded that the apartment manager was not an agent of the government after applying the two-part test used in *United States v. Howard*, 752 F.2d 220 (6th Cir.), *vacated on other grounds*, 770 F.2d 57, 62 (6th Cir. 1985). The magistrate judge also relied upon a Tennessee Court of Appeals negligence case, *Tedder v. Raskin*, 728 S.W.2d 343, 347-48 (Tenn. Ct. App. 1987), citing it as establishing the proposition that "[o]nce a landlord has notice sufficient to cause a reasonably prudent person to foresee the probability of such harm [to tenants resulting from third-party crimes on the premises], the landlord has a duty to act, and the failure to take reasonable steps to address the problem is a breach of that duty." J.A. at 65-66 (Mem. & Order at 9-10) (citing *Tedder*, 728 S.W.2d at 348).

Contrary to the conclusion of the magistrate judge, we believe that both *Howard* and *Tedder* support viewing the apartment manager as an agent of the government in this case. In *Howard*, we used a two-factor analysis developed by the Ninth Circuit to evaluate whether a private party is acting as an agent of the government, explaining that the "'critical factors . . . are: (1) the government's knowledge or acquiescence, and (2) the intent of the party performing the search.'" 752 F.2d at 227 (quoting *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981)). *Howard* involved an incident of alleged arson that both the police and the defendant's insurer investigated, and we observed that "where, as here, *the intent of the private party* conducting the search *is entirely independent* of the government's intent to collect evidence for use in a criminal prosecution, we hold that the private party is not an agent of the government." *Id.* (emphasis added). In Hardin's case, the officers testified that the ruse involving the apartment manager's entry to Apartment 48 to check for a non-existent water leak was "without a doubt" the officers' idea. Indeed, at trial, Kingsbury even testified that the officers "*sent* the manager" to verify Hardin's presence. J.A. at 267 (Trial Tr. at 33) (emphasis added). Prior to the officers' arrival and conversation with him, the apartment manager had absolutely no intent to search Apartment 48. Far from being "entirely independent" of the government's intent, the manager's intent to search Apartment 48 was wholly *dependent* on the government's intent.

In *Howard*, we also noted that "[t]he insurance company investigator was rightfully on the property to determine the liability of the insurance company" in light of a consent clause in the insurance contract. *Howard*, 752 F.2d at 227-28. Here, in contrast, Tennessee law provides that a "landlord may enter the dwelling unit without consent of the tenant *in case of emergency*" and defines emergency as "mean[ing] a sudden, generally unexpected occurrence or set of circumstances demanding immediate action." Tenn. Code Ann. § 66-28-403(b). The officers' mere suspicion that a fugitive felon might be on the premises does not constitute an emergency, and, even if it did, surely the "immediate action" contemplated would not include the landlord's unarmed, unescorted entry into the unit where the fugitive was suspected to be.

The magistrate judge also incorrectly relied on *Tedder* as establishing an independent reason for the manager to enter the apartment. *See* J.A. at 65 (Mot. to Reveal Identity Mem. & Order at 9) (citing *Tedder*). Although in *Tedder*, the Tennessee Court of Appeals did state that the common law

imposes a burden on landlords to take due care in regard to injuries to tenants resulting from third-party crimes on the premises, *Tedder*, 728 S.W.2d at 348, the court specifically explained and narrowed its holding, reasoning that "[i]f we held that the unsubstantiated suspicion of one tenant . . . is sufficient to give constructive notice of illegal activity, the landlord would be placed in the impossible position of being forced to act as a private law enforcement agency upon such 'notice.'" *Id.* at 350. The court described such a holding as "untenable," offering a further explanation that "the mere uncorroborated suspicion of illegal activity is not sufficient, as a matter of law, to give notice of a dangerous condition triggering the duty of the landlord to act." *Id.* Instead, the court explained that "[a]s in other negligence actions, the plaintiff will have to prove that the landlord was on notice of an unreasonable risk or likelihood of danger to his tenants caused by a condition within his control." *Id.* at 348. In affirming the trial court's grant of a directed verdict for the landlord in *Tedder*, the court noted that that "the criminal acts alleged in this case did not occur in the parking lot or a common area over which the landlord exercised control, but rather inside the apartment of another tenant with a reasonable expectation of privacy." *Id.* at 350. Contrary to the magistrate judge's analysis, *Tedder* shows that the officers' uncorroborated suspicions regarding the possible presence of Hardin in Apartment 48 did not give "notice" that would trigger the apartment manager's duty to act. Given that the apartment manager had no independent duty to act, the magistrate judge and the district court erred in finding that the manager was not an agent of the government.

In addition to our decision in *Howard* and the decision in *Tedder*, our decision in *United States v. Lambert*, 771 F.2d 83 (6th Cir. 1985), also shows that the apartment manager was acting as an agent of the government in this case. In *Lambert*, we cited *Howard* to support the proposition that "two facts must be shown" to demonstrate that a person was acting as an agent of the government: "First, the police must have instigated, encouraged or participated in the search" and "Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts." *Lambert*, 771 F.2d at 89. Here, the officers' testimony clearly satisfies both elements. First, Kingsbury testified that the ruse to send the manager into the apartment was "without a doubt" his idea. J.A. at 171-72. (Hr'g Tr. at 29-30). Second, Kingsbury testified that, after telling the manager about Hardin's criminal history, the manager expressed shock and said to the officers that "I don't want him on my property." J.A. at 151 (Hr'g Tr. at 9). This statement indicates that the manager had an intent to assist the officers with their effort to arrest and remove Hardin from the premises. Unlike the arson investigator for the insurance company in *Howard*, who was investigating the scene of the fire to determine his employer's liability, the manager was acting only to assist the officers by determining whether Hardin was present so that they could arrest him. Finally, *Tedder* demonstrates that simply hearing the officers' suspicion that Hardin might be present would not have exposed the manager to liability in that *Tedder* required plaintiffs complaining of a landlord's negligence in preventing third-party criminal conduct "to prove that the landlord was on notice of an unreasonable risk or likelihood of danger to his tenants caused *by a condition within his control*," and the court specifically noted that individual apartments were *not* such an area. *Tedder*, 728 S.W.2d at 348, 350 (emphasis added).

In sum, because the officers urged the apartment manager to investigate and enter the apartment, and the manager, independent of his interaction with the officers, had no reason or duty to enter the apartment, we hold that the manager was acting as an agent of the government.

### b. Did the Information Provided by the CI Establish Reason to Believe and/or Probable Cause that Hardin was Inside Apartment 48?

Because we hold that the apartment manager was acting as an agent of the government, to sustain the district court's denial of Hardin's motion to suppress would require holding that the information provided by the CI alone established sufficient reason to believe that Hardin was inside Apartment 48. As the majority explained in *Pruitt*, "[r]easonable belief is established by looking

at common sense factors and evaluating the totality of the circumstances." *Pruitt*, 458 F.3d at 482. In light of our case law and cases from other circuits, we conclude that, even under this "lesser" standard, which we will assume for the purposes of this section is applicable, the CI's information was not sufficient to establish a reasonable belief that Hardin was inside the apartment.

As an initial matter, neither the magistrate judge nor the district court squarely decided this issue; indeed, it is not entirely clear that the government argued to the district court that the information from the CI alone provided either probable cause or sufficient evidence to form a reasonable belief that Hardin was inside the residence.[7] Nonetheless, we have stated that "a denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for *any* reason." *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994) (emphasis added). Furthermore, the government devoted a substantial portion of its appellate brief to making essentially this argument. *See* Appellee Br. at 21-30 (arguing that, under *Pruitt*, the CI's information furnished a sufficient "reason to believe" that Hardin was present in the apartment). We thus now turn to considering whether the CI's information alone was sufficient to establish probable cause.

When compared to cases in our circuit and in our sister circuits, it is clear that the CI's information in this case, standing alone, did not establish even a lesser reasonable belief that Hardin was inside Apartment 48 at the time of the search. A common feature of these cases is recent, eye-witness evidence connecting the suspect to the residence, and often even conduct by the suspect that demonstrates a tie to the residence. The evidence in this case bears little resemblance to such cases.

In this case, in contrast, the CI—who was new to Kingsbury but who had shown reliability to Kingsbury by providing him accurate information regarding another case—provided relatively limited information. In sum, the CI told Kingsbury: (1) that "[*i*]*f* he [Hardin] is staying anywhere [in the area], he will be staying at this apartment," which the CI was able to describe but not identify by number, J.A. at 161 (Hr'g Tr. at 19) (emphasis added); (2) that Hardin was likely driving "a tan-colored, four-door vehicle, maybe a Caprice," J.A. at 160 (Hr'g Tr. at 18); (3) that the CI "had bought crack cocaine from Mr. Hardin in the past," J.A. at 161 (Hr'g Tr. at 19); (4) that the CI believed Hardin would be staying at the apartment with an unnamed woman, J.A. at 162 (Hr'g Tr. at 20). The CI, however, did *not* say when the CI had last seen Hardin or even that the CI had ever

---

[7] In the district court, the government did not appear to rely on the CI's information and instead argued that the information provided by the apartment manager supplied the evidence necessary for the officers to enter Apartment 48. For instance, in responding to Hardin's motion to reveal the identity of the CI, the government asserted that the officers "had probable cause to believe [Hardin] was inside based upon the apartment manager's verification that the defendant was inside" and that the CI's identity was "absolutely irrelevant." J.A. at 46-47 (Gov't Resp. to Mot. to Reveal Identity at 1-2). In its previously filed Response In Opposition to Hardin's motion to suppress, the government *did* refer to the CI, arguing that "the officers did not rely solely on that [confidential] informant's information, but went further to verify that they had a reasonable belief that the defendant was inside as required by *Payton*." J.A. at 32-33 (Gov't Resp. to Mot. to Suppress at 3-4).

   The district court and the magistrate judge, however, appear to have understood the government's position to be that the information provided by the CI did not establish the officers' right to enter the apartment to execute the arrest warrant. In denying Hardin's motion to reveal the identity of the CI, the district court noted the government's position that "the agents based their decision that they had probable cause to believe defendant was inside the apartment based on the apartment manager's verification." J.A. at 112 (Mot. to Reveal Identity Mem. & Order at 2). In later denying Hardin's motion to suppress, the district judge again referred to and adopted the conclusion in the magistrate judge's report that "although the arresting officer *admittedly did not have probable cause to enter the apartment based solely on an informant's tip*, the apartment manager's action in entering the apartment to determine if the defendant was present did provide the officers with probable cause." J.A. at 115 (Mot. to Suppress Mem. & Order at 2) (emphasis added); *see also* J.A. at 96 (Mot. to Suppress R&R at 15) ("The government counters that the officers did not rely on the confidential informant's tip for probable cause. Instead, the officers relied on the apartment manager's pre-entry confirmation that the defendant, in fact, was inside the apartment.").

   As explained above, however, despite this uncertainty about what the government argued in the district court, we will consider whether the CI's information alone provided evidence sufficient to form a reasonable belief that Hardin was inside the residence.

seen Hardin at that apartment. J.A. at 161-62 (Hr'g Tr. at 19-20). When the officers arrived at the apartment complex, they were able to identify the apartment that the CI had described, saw a tan vehicle parked nearby, and learned from the apartment manager that the described apartment was leased to a woman. J.A. at 149-50 (Hr'g Tr. at 7-8).

The limited information described above stands in stark contrast to that possessed by officers in other cases and fails to establish a reason to believe that Hardin was inside the apartment. For instance, in *Pruitt*, as described above, an anonymous caller contacted Pruitt's parole officer, indicating some familiarity with Pruitt, and told the parole officer that she had *seen* Pruitt at a particular address "within the past few hours." 458 F.3d at 478-79. Shortly after officers began surveillance of that address, they observed a man enter and soon thereafter leave the house. *Id.* The officers stopped the man and showed him a photograph of Pruitt, whom the man identified, using Pruitt's street name, as being *currently* inside the residence and in possession of crack cocaine. *Id.* at 479.

Further, as the majority in *Pruitt* noted, *id.* at 482, in our pre-*Payton* case of *United States v. McKinney*, 379 F.2d 259 (6th Cir. 1967), we affirmed the denial of a motion to suppress when FBI officers entered a residence to execute an arrest warrant based on three tips: one anonymous tip on the day of the search connecting the suspect to the residence, and two tips a month earlier from acquaintances of the suspect connecting the suspect to the residence. *McKinney*, 379 F.2d at 260-61, 264. Both cases thus involved recent—and, indeed, multiple—sources offering firsthand knowledge connecting the suspect to the residence.

Cases from other circuits also typically involve such recent and firsthand knowledge or involve evidence of the suspect's own conduct. For instance, in *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995), the Second Circuit observed that "a reliable CI, whose father was the landlord at [the apartment complex], told [the officer] that [the suspect] moved to the basement apartment during the weekend." Further, the CI also said that the suspect "was unemployed and typically slept late." *Id.* The Second Circuit accordingly held that "the officers had reason to believe—and, as the district court found, even had probable cause to believe—that [the suspect] lived in the basement apartment and was present at the time they sought to execute the warrant." *Id.*

In *United States v. Gay*, 240 F.3d 1222, 1224 (10th Cir. 2001), the defendant had fled in 1997 while on bail for charges relating to the possession of cocaine, and as a result the United States Marshals Service "made numerous attempts to locate and arrest [the defendant], based on an outstanding 1997 Drug Enforcement Agency arrest warrant issue for" the defendant. *Id.* In 1999, multiple informants provided information that the defendant was living with a relative, possibly an uncle, in Shawnee, Oklahoma. Based on this information, officers obtained a search warrant for residence of the defendant's uncle, but when they executed the warrant, they did not find the defendant. However, a confidential informant at the just-searched residence told the officers that the defendant was presently dealing drugs and armed at all times, and that "[t]he confidential informant knew, from personal experience and numerous visits, [the defendant] lived approximately two miles away." *Id.* at 1225. The informant then "accompanied the officers to [the specified residence], showed them the location of the house, pointed out the duplex, and told the officers [the defendant] was presently in his home." *Id.* Finally, shortly after the informant stated that the defendant was inside the home, an officer "knocked loudly on the front door of the residence and heard a thud from inside the home, which suggested to him a person was inside the duplex at that time." *Id.* at 1227. The Tenth Circuit held that this evidence established that "the officers reasonably believed [the defendant] lived in the residence and was within the residence at the time of entry." *Id.* at 1228.

In *United States v. Route*, 104 F.3d 59 (5th Cir. 1997), the officers had arrest warrants for two suspects, the defendant Route and another individual named Crossley. When the officers arrived at Route's residence, "they found Route backing his car out of the driveway and arrested him immediately." *Id.* at 61-62. As the Fifth Circuit noted, the officers' investigation had revealed that Crossley was likely living at Route's residence as well, given that the officers "had confirmed via Crossley's credit card applications, water and electricity bills, car registration, and receipt of mail that Crossley at least was representing to others that he was residing at" Route's residence. *Id.* at 62. When the officers arrested Route, he refused consent to search his residence, and an officer "walk[ed] around the perimeter of the house in search of Crossley" and "heard the television inside the residence and thus suspected that Crossley might be inside the residence." *Id.* at 62. The officer had also "noticed another vehicle remaining in the driveway." *Id.* at 63. As a result, the officer entered the residence to arrest Crossley; although the officer did not find Crossley, he observed in plain view "computer equipment and other items that he believed had been used in the commission of the bank fraud." *Id.* at 62. The Fifth Circuit affirmed the district court's denial of the defendant Route's motion to suppress this evidence, reasoning that the officers' investigation and observations at the scene supported a "reasonable belief that Crossley resided at" Route's residence and "were sufficient to form a reasonable belief that Crossley was in fact in the residence at the time of the warrant." *Id.* at 63.

In contrasting these cases to the facts in this case, we do not mean to say that officers must have multiple sources before entering a residence to execute an arrest warrant. Rather, these cases simply illustrate the gulf separating the amount and quality of knowledge possessed by the officers in this case from the officers in those cases in which entries have been found lawful.[8] Had the officer testified that the CI had seen Hardin *at the apartment*, this would be a much closer case. Instead, the officers knew only that a single confidential informant claimed that *if* Hardin was staying in the area, he would likely be at a particular described, but unidentified, apartment leased to an unidentified woman and that Hardin was driving a tan, four-door vehicle. J.A. at 160-61 (Hr'g Tr. at 18-19). The CI also asserted only that the CI "had bought crack cocaine from Mr. Hardin in the past" but the CI did *not* say when the CI had last seen Hardin or even that the CI had *ever* seen Hardin at the particular apartment. J.A. at 161-62 (Hr'g Tr. at 19-20). Certainly, the officers did learn that the described apartment belonged to a woman and that a tan vehicle was parked nearby, but the officers also learned that the apartment manager had never seen Hardin before. J.A. at 150-51 (Hr'g Tr. at 8-9). As a result, the officers may well have reasonably suspected that Hardin was

---

[8] The dissent contends that comparing the evidence in this case to other cases in which courts have found suppression unwarranted does "not illuminate the facts or circumstances necessary to justify suppression." Dis. Op. at 28 n.4. We find this a puzzling assertion. As we state in text, it may well be that the officers in those cases possessed *far* more than the required certainty and that lesser amounts of evidence might have furnished sufficient reason to believe that the person named in the arrest warrant was inside a residence. But certainly those cases help illuminate the nature of our inquiry and remain relevant to assessing the investigative practices the officers might have employed. Finally, the dissent mischaracterizes the facts in both *United States v. Wickizer*, 633 F.2d 900 (6th Cir. 1980), and *United States v. Buckner*, 717 F.2d 297 (6th Cir. 1983), in stating that "*Wickizer* indicates that a mere tip may be sufficient to establish 'reason to believe' and *Buckner* similarly suggests that a vague 'description of where the residence [i]s located' may be sufficient." Dis. Op. at 28 (internal citations omitted) (quoting *Buckner*, 717 F.2d at 301).

First of all, *Wickizer* involved a defendant arguing for the suppression of evidence seized during the search of a residence to execute an arrest warrant *naming another person*, facts comparable to *Steagald* and *Jones*, which the dissent acknowledges "is not on point with the present case." Dis. Op. at 24. Even if the case were on point, the officers in *Wickizer* had more than a "mere tip"—as we stated, they received a tip that the suspect, Smith, "was staying at a cabin with another man and woman," that "[t]he cabin was owned by Smith's stepbrother," and "[t]he police were told that Smith said he wouldn't be taken alive." *Wickizer*, 633 F.3d at 901. As with the cases mentioned in text, this evidence is suggestive of a witness directly and recently tying the suspect to the particular residence.

In *Buckner*, the officers obtained an address printed on an envelope that the suspect had been seen placing in a mail box, and when the officers visited that address, they met a woman "who identified herself as Buckner's girlfriend" and who then "informed them that [Buckner's] mother lived nearby" and gave them "only a description of where the residence was located" but no precise address. *Buckner*, 717 F.2d at 298 & n.1. The case thus simply does not establish that "a vague 'description of where the residence [i]s located' may be sufficient." Dis. Op. at 28.

generally living at this residence, but they had essentially *no* evidence to indicate that Hardin was *then* inside the apartment. Because *Payton* requires at a minimum that the officers have "a reasonable belief that the subject of the arrest warrant is within the residence *at that time*," *Pruitt*, 458 F.3d at 483 (emphasis added), the officers' entry violated the Fourth Amendment.

### c. Was the Officers' Search Valid Due to Consent?

Finally, as an alternative basis to uphold the district court's denial of Hardin's motion to suppress, the government argues that, even if we view the apartment manager as an agent of the government, the manager's search of Apartment 48 was legal due to consent obtained through the use of the "ruse." Appellee Br. at 35-36. This argument lacks merit.

The only evidence regarding the issue of consent[9] demonstrates that the manager did *not* obtain consent prior to entry, making the entry illegal. At the suppression hearing, Hardin testified that the manager, using his own key, simply entered the apartment and called out "Maintenance" after he entered. J.A. at 221-22 (Hr'g Tr. at 79-80). This evidence demonstrates that the apartment manager entered the apartment without receiving *any* communication or consent from any individual inside.[10] Even if a consent later followed, "[w]hen an individual consents to a search after an illegal entry is made, consent is not valid and 'suppression is required of any items seized during the search . . . , unless the taint of the initial entry has been dissipated before the 'consents' to search were given.'" *United States v. Chambers*, 395 F.3d 563, 569 (6th Cir. 2005) (quoting *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990)); *see also United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir. 1998) ("Consent to search that is given after an illegal entry is tainted and invalid under the Fourth Amendment.").

Furthermore, even assuming that the apartment manager merely called out through the closed door and did obtain consent prior to physically entering the apartment, then the manager's use of the ruse that he was investigating a water leak invalidated any possible consent. As a general proposition, although a ruse or officers' undercover activity does not usually violate individuals' rights,[11] we have noted that "[w]here, for example, the effect of the ruse is to convince the resident that he or she has no choice but to invite the undercover officer in, the ruse may not pass constitutional muster." *United States v. Copeland*, No. 95-5596, 1996 WL 306556, at * 3 n.3 (6th Cir. June 6, 1996) (citing *People v. Jefferson*, 43 A.D.2d 112 (N.Y. App. Div. 1973), as holding that consent was "not voluntary and search violat[ed the] Fourth Amendment where officers obtained

---

[9] The government did not appear to have advanced this argument to the district court, and accordingly the record on this point is somewhat sparse.

[10] The dissent simply ignores this fact and this aspect of our analysis. The analysis in the following paragraphs offers an *alternative* rationale, on the *assumption* that *even if* the manager obtained consent, the manager's search was illegal due to the deceptive ruse.

   We further note that the dissent misleadingly describes the record in claiming that "the apartment complex manager asked Hardin for permission to enter." Dis. Op. at 32. This supposed request for "permission to enter" came *after* the manager had already entered the apartment, and the request pertained to permission to enter the *bathroom*, not the apartment itself, which the manager had entered without any discussion.

[11] *See, e.g.*, *Lewis v. United States*, 385 U.S. 206 (1966). In *Lewis*, the Supreme Court held that "when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street." *Id.* at 211. The Supreme Court also distinguished the case before it from the facts in a prior case, *Gouled v. United States*, 255 U.S. 298 (1921), which the Court described as involving "a business acquaintance of the petitioner, acting under orders of federal officers, [who] obtained entry into petitioner's office by falsely representing that he intended only to pay a social visit." *Lewis*, 385 U.S. at 209. The Court stated that it "had no difficulty concluding that the Fourth Amendment had been violated by the secret and general ransacking, notwithstanding that the initial intrusion was occasioned by a fraudulently obtained invitation rather than by force or stealth." *Id.* at 210.

entry by saying that they were investigating [a] gas leak"); *see also* 2 Wayne R. LaFave *et al.*, CRIM. PROC. § 3.10(c) (3d ed.) (2007) ("[W]hen the police misrepresentation of purpose is so extreme that it deprives the individual of the ability to make a fair assessment of the need to surrender his privacy . . . the consent should not be considered valid."). Likewise, in *United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004) (en banc), we recognized that "[a] number of cases . . . have held that the confrontation between police and suspect was impermissibly tainted by 'duress, coercion [or] trickery.'" (quoting *Jones*, 641 F.2d at 429) (second alteration in original); *see also Hoffa v. United States*, 385 U.S. 293, 301 (1966) ("The Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area.")

We therefore conclude that the record does not show that the manager obtained consent when he entered the apartment; he simply used his own key and entered the unit. Additionally, even if the manager *did* receive consent, the ruse regarding the water leak presented a situation in which an individual would feel "no choice but to invite the undercover officer in" and any consent was invalid. *Copeland*, 1996 WL 306556, at *3 n.3; *see also United States v. Giraldo*, 743 F. Supp. 152, 153-55 (E.D.N.Y. 1990) (granting defendant's motion to suppress evidence when officer "pretended to be a gas company worker and told defendant she was checking for a gas leak" because "'[c]onsent' was obtained by falsely inducing fear of an imminent life-threatening danger").[12]

---

[12] Our dissenting colleague states that our reasoning on this issue is "completely unfathomable" and describes our view as relying simply upon "an unpublished opinion from this Circuit and a state court opinion." Dis. Op. at 31. Obviously, the numerous citations above soundly refute this latter contention. Nonetheless, we here include a few additional cases to illustrate the decidedly *non*-novel proposition that officers may invalidate an individual's consent through the use of certain ruses or trickery. *See, e.g.*, *United States v. Watzman*, 486 F.3d 1004, 1006-07 (7th Cir. 2007) (observing that the government did not challenge the district court's conclusion that a particular search was invalid when officers conducted a "phony 'burglary follow-up'" in which the officers visited the defendant's apartment and "told him they were following up on a burglary he had reported two years earlier" when the officers in fact were targeting the defendant in an investigation into child pornography); *Krause v. Commonwealth*, 206 S.W.3d 922, 924-28 (Ky. 2006) (stating that, in a case involving an officer who intended to search for drugs but invented a story that "a young girl had just reported being raped by [defendant's roommate] in the residence" and "asked if he could look around in order to determine whether her description of the residence and its furnishings was accurate," "[t]he use of this particular ruse simply crossed the line of civilized notions of justice"); *Butler v. Compton*, 158 F. App'x 108, 109, 111 (10th Cir. 2005) (holding that the plaintiff "has set forth a cognizable claim that [the officer] violated his Fourth Amendment right" when the officer knocked on the plaintiff's motel door and "replied that he was 'maintenance' and that he was there to fix the sink"); *United States v. Soto*, 124 F. App'x 956, 961 (6th Cir. 2005) ("The government has the burden of proving that a valid consent was obtained and 'that the consent was uncontaminated by duress, coercion, or trickery'") (quoting *Jones*, 641 F.2d at 429). Our dissenting colleague's view is particularly curious given that the dissent *itself* cites a case that contradicts the dissent's contention that our view is "completely unfathomable." Dis. Op. at 31, 32 (citing *Iowa v. Ahart*, 324 N.W.2d 317, 319 (Iowa 1982)). In *Ahart*, the Supreme Court of Iowa reversed the defendant's conviction because it "h[e]ld that if the police effect a ruse to obtain entry to a home based only on conjecture of criminal activity, incriminating evidence seen in plain view in the home does not provide probable cause to issue a subsequent search warrant." *Ahart*, 324 N.W.2d at 318.

We do emphasize that, in many circumstances (such as undercover activity designed to uncover illegal conspiracies and acts), ruses and deception may be a perfectly valid tactic for law enforcement. *See, e.g.*, *Lewis*, 385 U.S. at 210 (stating that a per se bar on deception would "severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings," such as "narcotics traffic"). Likewise, several courts have approved the use of deception in the *execution* of an arrest warrant so as to avoid the potential for violence. *See, e.g.*, *United States v. Michaud*, 268 F.3d 728, 731, 733 (9th Cir. 2001) (stating that, in case involving officer who "knocked on [the defendant's] door, claimed to be the assistant manager of the hotel and told her that her boyfriend was sick and needed her assistance," the defendant's "objection to the use of trickery to encourage her to open her hotel room door is unavailing, given the existence of a valid [arrest] warrant"); *Ahart*, 324 N.W.2d at 319 (stating that "[p]olice may use deceptive ploys to secure entry to execute a valid search or arrest warrant"). The problem here is that the deception was carried out by the apartment manager, who was certainly not executing the arrest warrant; rather, the apartment manager's ruse was used to ascertain whether the officers could execute an arrest warrant in compliance with *Payton*. The use of a ruse when officers *already* have probable cause or reason to believe that a person named in an arrest warrant is inside a residence involves an entirely different factual circumstance than that presented in this case.

In sum, we conclude that whether *Payton* involves a probable-cause standard or a lesser reasonable-belief standard remains an open question in our circuit, to be settled in an appropriate case. Further, we hold that the apartment manager in this case was acting as an agent of the government and that the officers' remaining information failed to establish even a reasonable belief that Hardin was inside Apartment 48. The search of Apartment 48 therefore violated Hardin's Fourth Amendment rights, and all evidence obtained as a result—the entirety of the evidence in this case—should have been suppressed.[13]

## III. CONCLUSION

For the reasons discussed above, we **REVERSE** the district court's denial of Hardin's motion to suppress, **VACATE** Hardin's conviction, and **REMAND** the case for further proceedings consistent with this opinion.

---

[13] Our dissenting colleague argues that, under *Hudson v. Michigan*, 547 U.S. 586 (2006), suppression of the evidence is inappropriate in this case. Dis. Op. at 33-34. We disagree. First, we agree with the Tenth Circuit that "the Supreme Court's holding [in *Hudson*] is based on considerations pertaining to the knock-and-announce requirement in particular rather than to other Fourth Amendment violations." *United States v. Cos*, 498 F.3d 1115, 1132 n.3 (10th Cir. 2007).

Second, even were we to agree with the dissent that *Hudson* has any application beyond the knock-and-announce context, the dissent ignores several glaring factual distinctions between *Hudson* and this case. The dissent contends that here, as in *Hudson*, "the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence" and that "[w]hether that preliminary misstep had occurred *or not*, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house." *Hudson*, 547 U.S. at 592; Dis. Op. at 33-34. The officers here had an arrest warrant for Hardin; the officers in *Hudson* had a *search* warrant: "Police obtained a warrant authorizing a search for drugs and firearms *at the home of* petitioner Booker Hudson." *Hudson*, 547 U.S. at 588 (emphases added). The officers in *Hudson* thus acted with the express purpose of searching for evidence at the defendant's home; the officers here simply had the objective of arresting Hardin, wherever they could find him. The dissent speculates about various other investigatory actions that the officers here could (and should) have pursued, and then concludes that "the manner by which they executed the arrest warrant had no bearing on the discovery of the evidence." Dis. Op. at 34. The record suggests otherwise. Had Hardin exited his apartment while the officers were talking to the apartment manager or other tenants, or while the officers were conducting surveillance of the apartment, the officers may well have simply arrested Hardin outside and taken him directly into custody. Indeed, the record shows that even though the officers arrested Hardin inside the apartment and believed that Hardin was inside the apartment due to an informant's belief that Hardin had a tan vehicle, the officers *did not search* that vehicle or even determine that Hardin had been driving it. J.A. at 286-87 (Trial Tr. at 52-53), 185-86 (Mot. to Suppress Hr'g Tr. at 43-44). Considerable doubt thus exists as to whether the officers would have discovered the evidence in this case had they not illegally entered the apartment without the requisite quantum of proof that the subject of their arrest warrant was currently inside the residence.

---

**CONCURRING IN PART, DISSENTING IN PART,
AND DISSENTING FROM JUDGMENT**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part; dissenting from the judgment. I agree that the district court's reliance on Tennessee tort law was misplaced, but I disagree with the remainder of the majority opinion. Instead, I find that *Pruitt*'s lesser-reasonable-belief standard is the law of this Circuit; that police — or agents of the police — may obtain consent to enter a suspect's hideout by ruse or deception; and that — at least since *Hudson v. Michigan*, 547 U.S. 586 (2006) — exclusion of the evidence would not be the proper remedy in this case.

More significantly, I disagree with the majority's treatment of *United States v. Pruitt*, 458 F.3d 477, 482 (6th Cir. 2007). By ignoring *Pruitt*'s clear reasoning and plain language, and instead conducting a *de novo* reconsideration of *Pruitt*'s facts in an effort to satisfy its preferred (alternative) version of the law, the majority has effectively circumvented *Pruitt*'s precedential effect. But, in doing so, the majority has also nullified *Pruitt*'s holding (i.e., recast it as "dicta") and supplanted *Pruitt*'s majority opinion with its concurring opinion. This is not the proper role for a panel of this court. Moreover, by authorizing this tactic, this opinion sets a troublesome precedent.

While I recognize that, under this new precedent, the possibility now exists that the analysis that follows might be resurrected by a future panel — i.e., some future panel could employ the majority's device and reconsider the decisions in this case (regarding the entry, the ruse, or the remedy), find that it prefers my view of these issues, and deem the majority's purported holdings unnecessary to the outcome and, hence, dicta — I take no comfort in such a possibility. With this opinion, the majority has untethered the law from its foundations and now allows for every decision to be *ad hoc*, limited only by the ingenuity of some future panel.

I cannot join the majority in such an opinion. Therefore, I must dissent.

## I. *PRUITT* IS THE LAW OF THIS CIRCUIT

The majority — considering the holding from *Payton v. New York*, 445 U.S. 573, 603 (1980), that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe* the suspect is within" (emphasis added) — poses the question of whether "reason to believe" means "reason to believe" or instead means "probable cause." The majority acknowledges that *Pruitt*, 458 F.3d at 482 (holding that, under *Payton*, "a lesser reasonable belief standard, and not probable cause, is sufficient to allow officers to enter a residence to enforce an arrest warrant"), is directly on point, but sidesteps *Pruitt* by labeling its reasoning and analysis "dicta" and treating its holding with less regard than it treats the since-overruled opinion of *United States v. Jones*, 641 F.2d 425, 428 (6th Cir. 1981) (holding that "an arrest warrant can authorize entry into a dwelling only where the officials executing the warrant have reasonable or probable cause to believe the person named in the warrant is within"). That is, the majority rejects *Pruitt*'s holding. But, I believe that — for better or worse — *Pruitt*'s "lesser reasonable belief standard" is the controlling law in this Circuit.

## A. Fourth Amendment Rights are Personal Rights — Protecting People, Not Places

Because "the Fourth Amendment protects people, not places," *Katz v. United States*, 389 U.S. 347, 349 (1967),[1] it "provides sanctuary for citizens wherever they have a legitimate expectation of privacy," *Minnesota v. Olson*, 495 U.S. 91, 96 n.5 (1990), and there is no dispute that Hardin was entitled to Fourth Amendment protection while in Ms. Reynolds's apartment. But, because "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted," *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978), Hardin may not assert Ms. Reynolds's rights, he may assert only his own. *See Georgia v. Randolph*, 547 U.S. 103, 120 (2006) (holding that a warrantless search of a shared dwelling was reasonable as to one occupant, who gave consent; but not to another, who did not). And, because Hardin was the subject of an arrest warrant, while Ms. Reynolds was not, his Fourth Amendment rights (i.e., protections) are different from hers. *Compare Payton v. New York*, 445 U.S. 573, 602 (1980), *with Steagald v. United States*, 451 U.S. 204, 205-06 (1981).

## B. *Payton* — Arrest Warrants and Reason to Believe

In *Payton*, 445 U.S. at 576, the Supreme Court considered whether the Fourth Amendment "prohibits the police from making a warrantless and non-consensual entry into a suspect's home in order to make a routine felony arrest." "[D]etectives had assembled evidence sufficient to establish probable cause to believe that Theodore Payton had murdered the manager of a gas station . . . [and] officers went to [his] apartment . . . intending to arrest him[, but] had not obtained a warrant." *Id.* After breaking open the door and entering the apartment, an officer spotted a shell casing in plain view and seized it as evidence to be used against Payton at trial. *Id.* at 576-77. Payton moved to suppress the shell casing on the basis that the warrantless entry was unconstitutional, but the trial court denied the motion. *Id.* at 577. On direct appeal, the New York Court of Appeals reasoned:

> [T]here is a substantial difference between the intrusion which attends an entry for the purpose of searching the premises and that which results from an entry for the purpose of making an arrest, and a significant difference in the governmental interest in achieving the objective of the intrusion in the two instances.

*Id.* at 579-80 (quotation marks, editorial marks, citation, and footnote omitted). So, New York's high court upheld the warrantless entry, but the case proceeded to the United States Supreme Court.

The Supreme Court's analysis began with a recitation of the Fourth Amendment's history, *id.* at 583-89, and culminated in a direct refutation of both the New York court's holding (i.e., that no warrant was necessary) and its reasoning (i.e., because search is different from arrest):

> [T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home

---

[1] In *Katz*, 389 U.S. at 349, the parties presented the Supreme Court with the question of "[w]hether a public telephone booth is a constitutionally protected area," but the Court declined that formulation of the issue and instead issued its now-familiar proclamation that "the Fourth Amendment protects people, not places." The Court reasoned that "once it is recognized that the Fourth Amendment protects people — and not simply 'areas' — against unreasonable searches and seizures[,] it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Id.* at 353. Instead, it is "the procedure of antecedent justification [i.e., the warrant requirement] that is central to the Fourth Amendment." *Id.* at 359 (quotation and editorial marks omitted). "Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." *Id.*

In the present case, the majority refers repeatedly to (and appears to adopt as precedent) the concurring opinion in *United States v. Pruitt*, 458 F.3d 477, 485 (6th Cir. 2006) (Clay, J. concurring), in which Judge Clay introduces the concept of a "premises search warrant," as though a search warrant applies to particular premises and all persons present therein, rather than to people individually, irrespective of the premises. *Katz* clearly rejects this concept.

> . . . . In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Id*. at 589-90. Thus, the Supreme Court held that "entries to search" and "entries to arrest" are not sufficiently different to justify dispensing with the warrant requirement altogether, and therefore, some type of warrant is necessary — indeed, virtually indispensable — in order to justify the entry into a suspect's home for purposes of effecting an arrest. But, the Court concluded its analysis by clarifying that a "search warrant" is not necessary; an "arrest warrant" will suffice:

> [T]he State[] suggest[s] that only a search warrant *based on probable cause to believe the suspect is at home at a given time* can adequately protect the privacy interests at stake, and since such a warrant requirement is manifestly impractical, there need be no warrant of any kind. We find this ingenious argument unpersuasive. *It is true that an arrest warrant requirement may afford less protection than a search warrant requirement*, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. *Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.*

*Id*. at 602-03 (emphasis added). Thus, the Court acknowledged "that an arrest warrant requirement may afford less protection than a search warrant requirement" — that "less protection" being the absence of a determination of "probable cause to believe the suspect is at home at a given time" — and held that, consistent with the Fourth Amendment, an officer holding a valid arrest warrant may enter "when there is *reason to believe* the suspect is within." *Id*. (emphasis added).

One other aspect of the *Payton* opinion is noteworthy here — the Court was emphatic about the limited extent of its holding: "Before addressing the narrow question presented by these appeals, we put to one side other related problems that are *not* presented today." *Id*. at 582-83 (emphasis in original; footnote omitted). The Court identified four issues that it was expressly not deciding, including "any question concerning the authority of the police, without either a search or arrest warrant, to enter a third party's home to arrest a suspect." *Id*. at 583. That question was left unresolved until April 1981, when the court decided *Steagald*, 451 U.S. at 205-06.

## C. Sixth Circuit Precedent — *McKinney* and *Jones*

In *United States v. McKinney*, 379 F.2d 259 (6th Cir. 1967), we had — some 13 years before *Payton* — already decided the aforementioned, unanswered question concerning police authority to enter the home of a third party to arrest a suspect, when the police have an arrest warrant but no search warrant. In *McKinney*, FBI agents went to the apartment of one Ella Mae Snyder, with an arrest warrant for one Louis Edward Baker, for the purpose of arresting Baker. *Id*. at 260. Upon arrival, three agents encountered appellant Roy McKinney descending the front stairs and asked if Baker was inside. *Id*. at 261. McKinney denied that he was. *Id*. Meanwhile, two other agents had entered the apartment from the rear and arrested Baker. *Id*. The government charged McKinney — who was not the subject of the original search warrant, but an otherwise unimplicated third party — with aiding, abetting, and harboring a fugitive, and McKinney moved to suppress the "evidence obtained as a result of the [] search of the Snyder apartment, including the fact of Baker's presence." *Id*. The trial court denied the motion, the jury convicted McKinney, and McKinney appealed. *Id*.

On appeal, we reversed because the trial court had failed to instruct the jury on McKinney's right to remain silent, but we also deemed it "useful to discuss [McKinney]'s other contentions because of the possibility that the same issues will arise should the government decide to proceed with a new trial." *Id*. at 262. Specifically, we addressed McKinney's contention that "in the absence of exceptional circumstances, a search warrant must be obtained before entering the dwelling of a third party to execute a valid arrest warrant." *Id*. In rejecting this contention, we reasoned:

> [E]ven if we were to accept [McKinney]'s premise that a search warrant must be obtained in the absence of exceptional circumstances, there is good reason to hold that the issuance of an arrest warrant is itself an exceptional circumstance obviating the need for a search warrant. An arrest warrant is validly issued only when a magistrate is convinced that there is probable cause to believe that the named party has committed an offense. This determination, together with the inherent mobility of the suspect, would justify a search for the suspect provided the authorities reasonably believe he could be found on the premises searched. In *Johnson* [*v. United States*, 333 U.S. 10, 15 (1947)], the Supreme Court itself suggested that in the case of a suspect 'fleeing or likely to take flight,' it would be unnecessary to obtain a search warrant. In order for the search which revealed the presence of Baker in the Snyder apartment to have been valid, however, it must be determined that the F.B.I. *reasonably believed* Baker to have been there.

*Id*. at 263 (citations and footnotes omitted; emphasis added).

So — working backwards through the analysis — we reasoned that the evidence discovered in the apartment (i.e., Baker) was admissible against third-party McKinney if it was in plain view; the evidence was in plain view if the officers were lawfully entitled to be where they were when they saw it (i.e., in the apartment); and, the officers were lawfully entitled to be in the apartment if they had an arrest warrant and "reasonably believed" Baker would be there. In a footnote concluding this passage, we explained the basis for our use of the phrase "reasonably believed":

> Restatement, Torts 2d, § 204 provides:
>
>> The privilege to make an arrest for a criminal offense carries with it the privilege to enter land in the possession of another for the purpose of making such an arrest, if the person sought to be arrested is on the land or if the actor reasonably believes him to be there.
>
> To the extent that this provision requires the arresting authority to have a reasonable belief that the person to be arrested is on the land to be entered, it is an accurate statement of what the Fourth Amendment demands when an arrest warrant is to be executed on the premises of a third party. But the mere fact that the person named in the warrant happens to be on the premises would not satisfy the Constitutional requirement that persons be free from unreasonable searches.

*Id*. at 263 n.3. Notably, neither of the above passages uses the phrase "probable cause."

Consequently, we said that a search warrant was unnecessary (i.e., it was not necessary for police to a make a further showing of probable cause regarding the location) to justify the entry into the dwelling of a third party to execute an otherwise valid arrest warrant. And, we concluded, "considering the totality of the available information, [] that the search of the Snyder apartment by the F.B.I. [] was not unlawful [and t]he fact of Baker's presence in the apartment was therefore properly received into evidence at [McKinney]'s trial." *Id*. at 264.

In *United States v. Jones*, 641 F.2d 425, 428 (6th Cir. 1981), we again addressed this question — whether police had authority, based on an arrest warrant but no search warrant, to enter the home of a third party to arrest a suspect, and the effect of that entry on the admissibility of evidence against a previously unimplicated person not the subject of the arrest warrant. Here, the police went to the residence of one Sarah Howard to execute an arrest warrant for one Earl Jones. *Id*. at 260. The officers' only bases for suspecting that Earl Jones would be present at Sarah Howard's home were: (1) a confidential informant's tip that Sarah was the girlfriend of Earl's brother, Harold Dean Jones, with the further "possibility" that Earl would be there; and (2) an officer's recollection that Earl and Harold Dean "used to associate together quite a bit." *Id*. at 427. Upon arriving at the residence, the officers demanded entry and entered, announcing that they had a warrant for Earl Jones. *Id*.

Inside the house, the officers found several items of incriminating evidence in plain view, including three rifles, two pistols, a shotgun, drug paraphernalia, and stolen stereo equipment. *Id*. at 427-28. They did not find Earl Jones. *Id*. at 428. But, based on this plain-view evidence the government indicted and prosecuted Harold Dean Jones on firearms and drug charges. *Id*. at 426. Notably, Harold Dean Jones — like Roy McKinney before him — was not the subject of the arrest warrant, but was instead merely a previously unimplicated third party. Prior to trial, Harold Dean Jones moved to suppress this evidence as the fruit of an unlawful search, but the district court denied the motion. *Id*. Eventually, the jury convicted him and he appealed. *Id*.

On appeal, we determined that the police had failed to demonstrate probable cause to justify their search, reversed the denial of Harold Dean Jones's motion to suppress, and vacated his conviction. *Id*. at 429. We reasoned that "an arrest warrant is not a search warrant" — noting that "an arrest warrant signifies no more than there is a reason to believe the person named in the warrant has committed a crime," i.e., it does not establish probable cause for an entry — and "government officials cannot invade the privacy of one's home without probable cause for the entry." Therefore, an arrest warrant "[b]y itself" was insufficient to justify the entry. *Id*. at 428. Then, citing to *Payton* generally, we announced an absolute rule (deeming it "a constitutional minimum") that: "[A]n arrest warrant can authorize entry into a dwelling only where the officials executing the warrant have reasonable or probable cause to believe the person named in the warrant is within." *Id*.

In a footnote concluding this passage, we explained that we were extending or extrapolating from *Payton*, inasmuch as *Payton* applied to cases in which the "entry is to the residence of the suspect," but "did not answer whether more is required where, as here, entry is to the premises of a third person." *Id*. at 428 n.3. We further stated — albeit imprecisely, since *McKinney*'s statement on this issue was not quite so rigid or unequivocal[2] — that "[t]his court has held that an arrest warrant and probable cause is sufficient, *United States v. McKinney*, 379 F.2d 259 (6th Cir. 1967), but other courts have since held or suggested that more is required." *Id*. (citing cases from the Third, Fourth, Fifth, and D.C. Circuits). Thus, relying on *McKinney* (and, tangentially, *Payton*), we carved out a middle ground position — a search warrant was not necessary, but an arrest warrant alone was not enough. In finding a middle ground, we required an arrest warrant plus probable cause (albeit without the interposition of a neutral and detached magistrate). On review we concluded that the officers had failed to show probable cause, explaining that "[t]hey were required only to have had sufficient trustworthy information to suggest that Earl Jones' presence was more likely than not," yet had failed to produce facts that even "suggest[ed] that it was probable or likely." *Id*. at 429.

---

[2] It appears that *McKinney*'s statement was also less burdensome, inasmuch as *McKinney* required the arresting officers to possess only an arrest warrant and a reasonable belief that the suspect was at the location. Under the *McKinney* articulation, which did not include the phrase "probable cause," it was not suggested that the arresting officers had to make a further showing of probable cause regarding the location. Nonetheless, "an arrest warrant and probable cause" would be "sufficient," as *Jones* asserted, since probable cause would encompass reasonable belief.

Thus, *Jones* — which required no search warrant — effectively formalized *McKinney*'s assertion that a search warrant was not necessary and that an arrest warrant was sufficient to authorize entry into a third-party's residence, but "only where the officials executing the warrant have *reasonable or probable cause* to believe the person named in the warrant is within." *Id*. at 428 (emphasis added). But *Jones* did not survive *Steagald*, and is no longer good law.

In fact, even if it were good law, *Jones* is not on point with the present case (as the majority appears to acknowledge). *Jones* addressed the admissibility of evidence against a previously unimplicated third party, such as Harold Dean Jones. It did not address the admissibility of evidence against the subject of the original arrest warrant, such as Earl Jones — Malik Hardin's equivalent.

### D. *Steagald* Overruled and Nullified *Jones*

A little over two months after our decision in *Jones*, the Supreme Court decided *Steagald*, in which it answered the same question we had decided in *Jones* — "whether, under the Fourth Amendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." *Steagald*, 451 U.S. at 205. But, the Supreme Court did not carve out any middle ground; it held that a search warrant is necessary.

In a fact pattern reminiscent of the two aforementioned cases — *McKinney* and *Jones* — the Court began by explaining that police, acting on a tip from a confidential informant, went to the residence of one Hoyt Gaultney to execute an arrest warrant for one Ricky Lyons. *Id*. at 206. The officers entered the home on the basis of the arrest warrant and, although they did not find Lyons, they observed cocaine in plain view. *Id*. Petitioner Gary Steagald, who was residing at the Gaultney home at the time of the search, was arrested and indicted on federal drug charges. *Id*. at 207. Steagald moved to suppress the evidence as the fruit of an unlawful search, but the trial court denied the motion. *Id*. Eventually, the jury convicted him and he appealed. *Id*.

Prior to embarking on its analysis, the Supreme Court acknowledged that the Circuits were divided on this issue, with "[t]wo Circuits hav[ing] joined the [Fifth Circuit] Court of Appeals in this case in adopting the [] view that a search warrant is not required in such situations if the police have an arrest warrant and reason to believe that the person to be arrested is within the home to be searched." *Id*. at 207 n.3 (citing *McKinney*, 379 F.2d at 262-63). Thus, when the Court reversed and held that "a search warrant must be obtained absent exigent circumstances or consent," *id*. at 205-06, it expressly reversed our position in *McKinney* and, by implication, our holding in *Jones*. *See also Pembaur v. City of Cincinnati*, 882 F.2d 1101, 1105 (6th Cir. 1989) ("Indeed, prior to the decision in *Steagald*, the law of this Circuit was that a search warrant was not required to search premises belonging to a third party for the subject of an arrest warrant when the police had both an arrest warrant and reason to believe that the person to be arrested was inside the premises.").

The Court framed the issue by distinguishing *Payton* because of Gary Steagald's status as a previously unimplicated third party, whereas Ted Payton had been the subject of the arrest warrant:

> Here, of course, the agents had a warrant — one authorizing the arrest of Ricky Lyons. However, the Fourth Amendment claim here is not being raised by Ricky Lyons. Instead, the challenge to the search is asserted by a person not named in the warrant who was convicted on the basis of evidence uncovered during a search of his residence for Ricky Lyons. Thus, the narrow issue before us is whether an arrest warrant — as opposed to a search warrant — is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances.

*Id*. at 212. The Court relied on this distinction in its reasoning:

In sum, two distinct interests were implicated by the search at issue here — Ricky Lyons' interest in being free from an unreasonable seizure and [Gary Steagald]'s interest in being free from an unreasonable search of his home. Because the arrest warrant for Lyons addressed only the former interest, the search of [Steagald]'s home was no more reasonable from [Steagald]'s perspective than it would have been if conducted in the absence of any warrant. Since warrantless searches of a home are impermissible absent consent or exigent circumstances, we conclude that the instant search violated the Fourth Amendment.

*Id*. at 216. And, in response to the government's arguments, the Court explained:

The authorities on which the Government relies were concerned with whether the subject of the arrest warrant could claim sanctuary from arrest by hiding in the home of a third party. Thus, in *Semayne's Case* it was observed:

'The house of any one is not a castle or privilege but for himself, and shall not extend to protect any person who flies to his house, or the goods of any other which are brought and conveyed into his house, to prevent a lawful execution, and to escape the ordinary process of law; for the privilege of his house extends only to him and his family, and to his own proper goods.'

The common law thus recognized, as have our recent decisions, that rights such as those conferred by the Fourth Amendment are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched. *The issue here, however, is not whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home, but rather whether the residents of that home can complain of the search.* Because the authorities relied on by the Government focus on the former question without addressing the latter, we find their usefulness limited. Indeed, if anything, the little guidance that can be gleaned from common-law authorities undercuts the Government's position.

*Id*. at 218-19 (editorial marks and certain citations omitted; emphasis added). The Court concluded by acknowledging: "As noted in *Payton* [], an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest." *Id*. at 222 (citations and footnotes omitted).

In the present case, the arrest warrant was for Malik Hardin, who was hiding or residing in the apartment of Germaine Reynolds; the police arrested and charged Hardin, not Reynolds; the government prosecuted and convicted Hardin, not Reynolds; and it is Hardin who appeals, not Reynolds. *Steagald* does not apply to the facts of this case and, more importantly, *Jones* — even if it had survived *Steagald* — would not apply either because the appellant, Hardin, was the person named in the arrest warrant. *See United States v. Buckner*, 717 F.2d 297, 300 (6th Cir. 1983) ("The fact that the defendant was the person named on the arrest warrant mandates application of *Payton* rather than *Steagald*."). To the extent that Hardin was residing in Reynolds's apartment (i.e., the police arrested Hardin in his own home), then *Payton* applies directly. And, to the extent that Hardin was merely a guest in Reynolds's apartment (i.e., the police arrested Hardin in another person's home), then the Supreme Court has yet to rule directly on this situation. In either of these latter two instances, however — one of which certainly applies — *Pruitt* controls in our Circuit.

## E. *Pruitt* is the Controlling Law on this Issue in the Sixth Circuit

In *United States v. Wickizer*, 633 F.2d 900, 901 (6th Cir. 1980), a case decided shortly after *Payton* (but before *Steagald*), we relied on *Payton*'s holding that an officer possessing a valid arrest

warrant may enter the suspect's premises to execute the arrest warrant "when there is *reason to believe* the suspect is within." *Payton*, 445 U.S. at 602-03. The specific question in *Wickizer* was whether the police — upon arriving at a cabin to execute an arrest warrant for one Ernest Smith — had reason to believe that Smith was inside based solely on "a tip that Smith was staying at [the] cabin with another man and woman and that . . . [t]he cabin was owned by Smith's stepbrother." *Wickizer*, 633 F.2d at 901. We resolved this question succinctly, concluding that "[w]e believe the police were properly authorized to enter the cabin." *Id.* (citing *Payton*). Thus, in *Wickizer*, the tip and the suspect's relation to the owner were sufficient to establish "reason to believe."

In *United States v. Buckner*, 717 F.2d 297, 297-98 (6th Cir. 1983), a case decided shortly after *Steagald*, we considered "whether an arrest warrant and/or search warrant was required to arrest [Buckner] at his mother's home." Ultimately, we decided the appeal on Fourth Amendment standing — finding that Buckner could not show "a legitimate expectation of privacy in his mother's apartment" — but opined further that even if Buckner had standing to challenge the search, the district court correctly denied the suppression motion "because the police had a warrant for [Buckner's] arrest and reason to believe that he was in his mother's apartment." *Id.* at 300. Although this portion of the *Buckner* opinion is clearly dicta — in the traditional sense — this portion of *Buckner* underlies the theory and reasoning of *Pruitt* and is therefore worth reciting.

Dennis Buckner was a suspect in a bank robbery that went something like this: at approximately 2:30 p.m., a man walked into the bank with a large manila envelope, ordered the teller to put money in it, and, after she did, fled the bank and deposited the envelope in a public mail box across the street. *Id.* at 298. Unfortunately for the robber, a witness directed the police to the mailbox and, upon retrieving the envelope, the police recovered the cash and found that the envelope was addressed to Buckner at 3289 DuVall Drive. *Id.* The FBI arrived at approximately 4:00 p.m. and, by 5:00 p.m., the police and FBI had arrived at 3289 DuVall Drive with an arrest warrant. *Id.* Buckner was not there. *Id.* Instead, the police spoke with one Claudette Thompson (Buckner's girlfriend), who informed them that Buckner's mother lived nearby. *Id.* But:

> The officers did not get a precise address for the mother's residence from Thompson; rather, they got only a description of where the residence was located, and they had some trouble locating it. After the officers knocked on at least one door in error, Detective Brubrink approached 3214 DuVall and, according to his testimony, knocked on the door which was answered by Buckner's brother. When the door was opened, Brubrink was able to see appellant Buckner sitting in a chair in the apartment. Brubrink and the other officers then entered, informing Buckner that the FBI had a bench warrant for him for carrying a concealed deadly weapon. . . . In the living room where they arrested Buckner, [the police] seized in plain view manila envelopes resembling the one in which the stolen money had been placed, a pen, and a field jacket which they 'patted down' for weapons. The jacket contained a notebook, with the following note: 'Larry Hughes, use bank at 4th Street, 2:30.'

*Id.* Buckner moved to suppress the evidence and the district court denied the motion. *Id.*

On appeal, we began our analysis by stating that "[t]wo recent Supreme Court cases, *Steagald* [] and *Payton* [], form the framework for our discussion," *id.* at 299, and explained that "[t]he fact that [Buckner] was the person named on the arrest warrant mandates application of *Payton* rather than *Steagald*." *Id.* at 300. Relying on *Payton* — i.e., "Under *Payton*, the police could have entered the defendant's own home if they had a warrant for his arrest and reason to believe that he was inside." *id.* — we concluded that, "assuming that [Buckner] did have a legitimate expectation of privacy in his mother's apartment, the [police] entry was proper because the police had a warrant for his arrest plus reason to believe that he was inside." *Id.* at 301. Thus, a suggestion (at most) that the suspect might be at his mother's residence and an imprecise "description of where

the residence was located" (from which "the officers knocked on at least one door in error") was sufficient to afford the officers "reason to believe" that Buckner was there, and thereby satisfy *Payton*.

In *United States v. Pruitt*, 458 F.3d 477, 481-82 (6th Cir. 2006), we specifically considered "whether officers may rely on an arrest warrant, coupled with the reasonable belief that the subject of the warrant is within a third-party's residence, to enter that residence to execute the warrant"; and whether "a lesser reasonable belief standard, and not probable cause, is sufficient to allow officers to enter [the] residence to enforce [the] arrest warrant." We answered both in the affirmative.

When Demetrius Pruitt failed to report to his parole officer, the court issued an arrest warrant. *Id*. at 478. Based on an anonymous tip, some surveillance, and another informant's unverified statement, the police determined that Pruitt was at his girlfriend's home. *Id*. at 478-79.[3] Upon arriving at the girlfriend's home, the police "found Pruitt hiding in a kitchen closet" and performed a protective sweep of the premises, whereupon they "found several bags of crack cocaine, marijuana, a wallet, and a loaded .25 caliber pistol[,] all within plain view." *Id*. at 479. The police arrested Pruitt, the government charged him for the drugs and the firearm, and Pruitt moved to suppress the evidence as the result of an illegal search. *Id*. The trial court originally granted the motion, but upon the government's request to reconsider, reversed itself and denied the motion. *Id*.

On appeal, we distinguished *Steagald* and stated the issue as "whether officers may rely on an arrest warrant, coupled with the reasonable belief that the subject of the warrant is within a third-party's residence, to enter that residence to execute the warrant." *Id*. at 481. We explained that "[w]e ha[d] already considered this issue, albeit in dicta, in *Buckner*," and then adopted *Buckner*'s reasoning, explaining that "the rationale underlying *Buckner* is applicable here," to wit:

> Under *Payton*, the police could have entered the defendant's own home if they had a warrant for his arrest and reason to believe that he was inside. It would be illogical to afford the defendant any greater protection in the home of a third party than he was entitled to in his own home. That illogical result, however, is precisely what would happen if we accepted the defendant's contention that *Steagald* required a search warrant in this case.

*Id*. at 481-82 (quoting *Buckner*, 717 F.2d at 300). Pruitt argued that, even without a search warrant, the police must still establish probable cause to believe a suspect is in the home, on the theory that "reasonable belief" in *Payton* actually means "probable cause." *Id*. at 482. And, Pruitt insisted, "the police did not have reason to believe that he was in the home at the time of his arrest," *Id*.

We rejected Pruitt's argument and held "that reasonable belief is a lesser standard than probable cause, and that [police need only have a] reasonable belief that a suspect is within the residence, based on common sense factors and the totality of the circumstances, [in order] to enter a residence to enforce an arrest warrant." *Id*. at 485. We offered two reasons for this holding:

> First, we do not agree . . . that a 'reasonable ground for belief of guilt' is the grammatical analogue to a reasonable belief that an individual is located within a premises subject to search. These are two entirely different inquiries.

---

[3] The police had obtained a search warrant before entering the girlfriend's home to search for and arrest Pruitt, but the district court determined that the search warrant was invalid because "it lacked indicia of probable cause." *Pruitt*, 458 F.3d at 480. We affirmed that portion of the district court's opinion, *id*. at 480-81, and considered the question of whether an arrest warrant and reasonable belief were enough, as though there had never been a search warrant.

> Second, . . . it is more than likely that the Supreme Court in *Payton* used a phrase other than 'probable cause' because it meant something other than 'probable cause.' . . . The *Payton* Court's use of 'probable cause' in describing the foundation for an arrest warrant and its use of 'reason to believe' in describing the basis for the authority to enter a dwelling shows that the Court intended different standards for the two. Had the Court intended probable cause to be the standard for entering a residence, it would have either expressly stated so or used the same term for both situations. Instead, its use of different terms indicates that it intended different standards [to] apply.

*Id.* at 484 (citations, quotation marks, and editorial marks omitted; paragraph break added). Furthermore, we explained, "it is evident that the Supreme Court does not use the terms probable cause and reasonable belief interchangeably, but rather that it considers reasonable belief to be a less stringent standard than probable cause." *Id.* (citing *Maryland v. Buie*, 494 U.S. 325 (1990)).

Thus, we have found consistently that when police enter a third-party's residence to execute an arrest warrant, any evidence that they observe in plain view while executing that warrant may be admitted in a subsequent case against the subject of that arrest warrant, so long as the police had a "reason to believe" that the subject of the warrant was within a third-party's residence. Furthermore, that "reasonable belief," based on common sense factors and the totality of the circumstances, is a lesser standard than probable cause. This is the basis for the *Pruitt* decision, and it is the controlling precedent and the law of this Circuit. Moreover, *Wickizer*, 633 F.2d at 901, indicates that a mere tip may be sufficient to establish "reason to believe" and *Buckner*, 717 F.2d at 301, similarly suggests that a vague "description of where the residence [i]s located" may be sufficient.[4]

In the present case, the police received a tip from a confidential informant, advising that Malik Hardin was staying with his girlfriend at a particular apartment complex. Although the informant did not provide the apartment number, he described the apartment and its location within the complex, and he described the car that Hardin had been driving. When the police arrived at the apartment complex, they were able to locate the apartment based on the informant's description, and they verified the location when they identified the car parked nearby. Consulting the apartment manager, the police confirmed that a single tenant, a woman, leased the apartment in question, though the manager had not seen Hardin on the complex premises. From this, I believe that, under the guidance of our established precedent — *Wickizer*, *Buckner*, and *Pruitt* — the trial court was justified in finding that the police had a reasonable belief, based on common sense factors and the totality of the circumstances, that Hardin was present within Ms. Reynolds's apartment.

### F. *Pruitt*'s Holding is not Dicta

Black's Law Dictionary defines a "holding" as: "A court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary (8th ed. 2004), holding. In *Pruitt*, the court considered the parties' opposing arguments on the two standards:

---

[4] In an attempt to demonstrate that the information known to the police was insufficient to establish a "reason to believe" that Hardin was in Ms. Reynolds's apartment, the majority cites five cases — *Pruitt*, *McKinney*, *Lauter*, *Gay*, and *Route* — all of which involved a sufficient "reason to believe" the suspect was at the suspected location and, correspondingly, none of which involved circumstances necessitating suppression. *See* Maj. Op. at § II.B.2.b. But the majority cites no case — other than the present case — as an example of the facts or circumstances that would fail to establish "reason to believe" and thereby warrant suppression. Instead, the majority attempts to justify its conclusion by emphasizing the "gulf" that separates those cases from this case — and its apparent assumption that if cases on one side of the "gulf" do not justify suppression, then cases lying on the other side of that "gulf" must. I am not persuaded. As *Wickizer* and *Buckner* demonstrate, both sides of this "gulf" are above the threshold requiring suppression and, therefore, the cases cited by the majority do not illuminate the facts or circumstances necessary to justify suppression.

Pruitt urges this court to adopt the Ninth Circuit's ruling in *United States v. Gorman*, 314 F.3d 1105 (9th Cir. 2002)[, in which it] ruled that probable cause was required to support the reasonable belief that the subject of an arrest warrant was in a third-party's residence. Pruitt contends that the officers here could not have had probable cause based only on an uncorroborated anonymous tip and the statement of an unknown and untested drug-seeking informant who provided the officers with fraudulent identification. Pruitt argues that such evidence is insufficient to meet the probable cause standard enunciated in *Gorman*.

In response, the Government argues that while a circuit-split does exist, a majority of the circuits that have ruled on the issue have determined that a lesser reasonable belief standard, and not probable cause, is sufficient to allow officers to enter a residence to enforce an arrest warrant, and that the officers here had adequate information in this case to meet this standard. We agree.

*Pruitt*, 458 F.3d at 482. The *Pruitt*-majority then applied the facts to this newly adopted law:

In this case, the LASSO team evaluated the totality of the circumstances, and formulated a reasonable belief that Pruitt was present at 2652 Meister Road. The team relied on the anonymous tip given to Pruitt's parole officer, Garcia's identification of Pruitt as 'Meaty' in a photograph, and his assertion that 'Meaty' was in the residence at that time selling drugs. [T]he Lasso team considered Pruitt's background information, including his drug dealing past and his street name, to develop a reasonable belief that Pruitt was in the residence.

*Id*. at 483. Finally, the *Pruitt*-majority stated its holding and rejected the concurrence:

[W]e hold that an arrest warrant is sufficient to enter a residence if the officers, by looking at common sense factors and evaluating the totality of the circumstances, establish a reasonable belief that the subject of the arrest warrant is within the residence at that time.

Our holding contrasts with that of the Ninth Circuit, which alone has ruled that reasonable belief is the equivalent of probable cause in determining whether a suspect is within the residence. The concurring opinion suggests that we should adopt this ruling. . . . We decline to adopt this view . . . .

*Id*. at 483-84 (certain citations omitted).

So, the *Pruitt* court considered arguments on the law, stated the law for this Circuit, applied the facts, and rendered a decision based on that law and those facts. In every case but this one, that would be a "holding." In this case — according to the majority — that decision is dicta.[5]

Black's Law Dictionary defines dicta, or "obiter dictum," as: "A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." Black's Law Dictionary (8th ed. 2004), obiter dictum. The definition also contains this further explanation:

---

[5] I will concede that am inclined to agree with the majority up to a point. That is, even if the majority were correct that the facts of *Pruitt* satisfy probable cause — a finding that the *Pruitt* majority clearly did not make — then I would agree that the *Pruitt* majority could have, and perhaps should have, deferred decision on the probable-cause vs. reason-to-believe standard. But I cannot agree with the crux of the majority's analysis, which is that the *Pruitt* majority was *required* to defer the decision or that the *Pruitt* concurrence — by arguing the bases for deferral — somehow usurped the *Pruitt* majority's ability to make this decision and state a holding. This contention simply goes too far.

> Strictly speaking an 'obiter dictum' is a remark made or opinion expressed by a judge, in his [or her] decision upon a cause, 'by the way' — that is, incidentally or collaterally, and not directly upon the question before the court; or it is any statement of law enunciated by the judge or court merely by way of illustration, argument, analogy, or suggestion . . . . In the common speech of lawyers, all such extrajudicial expressions of legal opinion are referred to as 'dicta,' or 'obiter dicta,' these two terms being used interchangeably.

*Id*. (citing William M. Lile *et al.*, Brief Making and the Use of Law Books 304 (3d ed. 1914)).

The majority contends that, upon "careful review of the facts in *Pruitt*," the *Pruitt*-majority's legal determination was not necessary to the outcome of the case and, therefore, the *Pruitt*-majority's opinion is all dicta and no holding. But, if a proffered opinion has no holding — i.e., if the entire opinion is dicta — then that opinion is merely advisory, and we are not in the business of rendering advisory opinions. Therefore, every appellate opinion must have some form of holding. The majority suggests that the *Pruitt* concurrence is actually its holding. But a holding must also have the endorsement of at least two of the three panel members (hence the term "majority"), and the *Pruitt* concurrence has only one endorsement — in fact, the *Pruitt* majority expressly rejected the concurring judge's argument. *Pruitt*, 458 F.3d at 483-84 ("The concurring opinion suggests . . . . We decline to adopt this view . . . ."). Therefore, *Pruitt*'s concurrence cannot be its holding.

So, let us consider this simple syllogism: an appellate decision must have a holding; a single-member's position cannot, alone, be a holding; *ergo*, the two-member (majority) position must be the holding. And yet, we are nevertheless left with the present dilemma — the majority has effectively nullified the *Pruitt*-majority's position (i.e., holding) by calling it "simply dicta."

> Once when a deputation visited [President Lincoln] and urged emancipation before he was ready, he argued that he could not enforce it, and, to illustrate, asked them: 'How many legs will a sheep have if you call the tail a leg? They answered, 'Five.' 'You are mistaken,' said Lincoln, 'for calling a tail a leg don't make it so'; and that exhibited the fallacy of their position more than twenty syllogisms.

Lincoln's Own Stories 115-16 (Anthony Gross ed., Kessinger Publishing 2005) (Harper & Brothers 1912). So, how many holdings does an opinion have if you call its holding dicta?

## II.  CONSENT TO ENTER A DWELLING CAN BE OBTAINED BY DECEPTION, TRICK, OR RUSE — IT NEED NOT BE KNOWING AND INTELLIGENT

The majority asserts that the apartment manager was acting as an agent of the police when he entered Ms. Reynolds's apartment in search of Malik Hardin and, rather than acknowledging Hardin's consent to the entry, the majority holds that the apartment manager (i.e., the agent of the police) invalidated Hardin's consent by deceiving Hardin through the use of a trick or a ruse — that is, by entering under the guise of investigating a water leak that did not actually exist. I am compelled to agree with the district court that the manager was not an agent of the police, inasmuch as I cannot say that the court's findings are clearly erroneous. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996) (we review findings of fact for clear error); *United States v. Koenig*, 856 F.2d 843, 848 (7th Cir. 1988) ("the existence of an agency relationship is a question of fact"). But, I concede that it is a close question and I do find the majority's reasoning compelling on this issue. As for the issue of consent, however, I find the majority's view and explanation completely unfathomable.

Contrary to the majority's assertion — that because entry to the apartment was gained by the use of deception, the entry was illegal — I find that "it is well established that an undercover officer may gain entrance by misrepresenting his identity and may gather evidence while there." *United*

*States v. Pollard*, 215 F.3d 643, 648 (6th Cir. 2000) ((citing *Lewis v. United States*, 385 U.S. 206, 209 (1966), and *United States v. Baldwin*, 621 F.2d 251, 252-53 (6th Cir. 1980)); *see also United States v. Lord*, 230 F. App'x 511, 514 (6th Cir. 2007) ("Therefore, the agents' entry into Lord's home under the guise of being real estate investors and the use of that ruse to look into his bedroom closet did not constitute an unreasonable search prohibited by the Fourth Amendment."); *United States v. Hankins*, 195 F. App'x 295, 302 (6th Cir. 2006) ("A person may still validly consent to a guest's entry, even if the guest lies about his or her identity or the reasons for the entry.").

The majority instead relies on an unpublished opinion from this Circuit and a state court opinion. *See United States v. Copeland*, 89 F.3d 836 (table), 1996 WL 306556, 1996 U.S. App. LEXIS 17177 (6th Cir. June 6, 1996); *New York v. Jefferson*, 43 A.D.2d 112 (N.Y. App. Div. 1973). But, I am unpersuaded, as I find the former inapposite and the latter simply incorrect.

In *Copeland*, 89 F.3d at 836, three officers arrived at Barbara Copeland's home with a search warrant intending to search for drugs. In a plan designed to prevent Ms. Copeland from quickly disposing of any drugs, one officer pretended to be a stranded motorist and knocked at the door asking to use the phone. When Ms. Copeland answered the door, the other two officers emerged from hiding and rushed in to execute the warrant. The officers discovered drugs and arrested Ms. Copeland. The government prosecuted her and the district court denied her motion to suppress.

Ms. Copeland appealed, arguing that the "use of [the] ruse converts what would be reasonable into something constitutionally unreasonable." *Id*. We rejected her argument, saying:

> There is no support for this proposition, and we do not accept it. The use of subterfuge in law enforcement activities has long been recognized by the Supreme Court, which in the context of undercover operations has stated that the Government is entitled to use decoys and to conceal the identity of its agents. The Bill of Rights, of course, provide[s] checks upon such official deception for the protection of the individual. In *Lewis* [*v. United States*, 385 U.S. 206 (1966)], the Supreme Court held that the fact that the resident invited the undercover agent, without knowing that he was a government agent, to his home to purchase drugs was irrelevant in determining that he gave his consent to enter voluntarily. Therefore, even if consent is obtained by deceit, courts will still, in most circumstances, find consent freely given.

*Id*. (citations, quotation marks, and editorial marks, and footnote omitted).

The majority actually quotes from a footnote in the opinion, for the proposition that "[w]here, for example, the effect of the ruse is to convince the resident that he or she has no choice but to invite the undercover officer in, the ruse may not pass constitutional muster." *Id*. at n.3. While this statement is true, so far as it goes, it is inapplicable to the present case — the quoted proposition actually stems from cases in which the police pretended to have a warrant when they did not. *See Bumper v. North Carolina*, 391 U.S. 543, 546 (1968). The Supreme Court explained:

> In *Bumper*, a 66-year-old Negro widow, who lived in a house located in a rural area at the end of an isolated mile-long dirt road, allowed four white law enforcement officials to search her home after they asserted they had a warrant to search the house. We held the alleged consent to be invalid, noting that when a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion — albeit colorably lawful coercion. Where there is coercion there cannot be consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 234 (1973); *see also United States v. Biswell*, 406 U.S. 311, 315 (1972) (in *Bumper*, "the police relied on a warrant that was never shown to be valid").

The present case did not involve any police coercion — it was the apartment complex manager, not the police, who entered Ms. Reynolds's apartment and there was no show of authority (or pretend warrant), there was merely subterfuge. Even proceeding from the majority's position that the apartment complex manager was an agent of the police, he was still not exerting the authority of the police; he represented himself as the apartment complex manager, which, of course, is just what he was. Moreover, there is no basis to conclude that Hardin felt helpless to keep the manager out or that he had no choice but to let him in. As the majority explained quite ably:

> Hardin testified that the manager simply entered the apartment, using a key, and called out 'Maintenance.' At that time, Hardin was in the back bedroom, talking on a cell phone to [Ms.] Reynolds. Hardin asked her what to do, and she told him to ask what they wanted. Hardin stated that the manager 'said there is a water leak upstairs in the upstairs apartment. Is it all right if I come in and check your bathroom?' and that he related this information to [Ms.] Reynolds. In response, she stated 'yes, I guess,' and Hardin told the manager he could look at the bathroom. After checking the bathroom, the manager stood in the hallway outside the bedroom, looked in, and asked Hardin if he had heard any water running.

Maj. Op. at § I.A (record citations omitted). Thus, the apartment complex manager asked Hardin for permission to enter, but more importantly, Hardin asked Ms. Reynolds if he should grant the manager permission — the obvious, unstated premise being that Hardin could forbid entry if Ms. Reynolds so instructed. Furthermore, Hardin did not give the manager freedom to roam, he told the manager he could look in the bathroom. This does not indicated that Hardin felt he had no choice.

I also disagree with the majority's suggestion that the police in this case "falsely induc[ed] fear of an imminent life-threatening danger," *United States v. Giraldo*, 743 F. Supp. 152, 154 (E.D.N.Y. 1990), by alleging a water leak. In addition to this Circuit's established precedent, I find that this case is also on point with numerous other cases in which courts all across America have held that consent to enter a suspect's hideout may be obtained by trickery, deception, or ruse. *See*, *e.g.*, *United States v. Ojeda-Ramos*, 455 F.3d 1178, 1184 (10th Cir. 2006); *United States v. Alejandro*, 368 F.3d 130, 136 (2d Cir. 2004); *Storck v. Coral Springs*, 354 F.3d 1307, 1319 (11th Cir. 2003); *United States v. Michaud*, 268 F.3d 728, 733 (9th Cir. 2001); *Hawai'i v. Dixon*, 924 P.2d 181, 191 (Haw. 1996); *Michigan v. Catania*, 398 N.W.2d 343, 346 (Mich. 1986); *Iowa v. Ahart*, 324 N.W.2d 317, 319 (Iowa 1982); *Wyche v. Florida*, 906 So.2d 1142, 1144 (Fla. Dist. Ct. App. 2005); *Colorado v. Zamora*, 940 P.2d 939, 942 (Colo. Ct. App. 1996); *Pennsylvania v. Morrison*, 418 A.2d 1378, 1381 (Pa. Super. Ct. 1980); *Illinois v. Bargo*, 382 N.E.2d 83, 84 (Ill. App. Ct. 1978).

### III. SUPPRESSION OF THE EVIDENCE IS NOT JUSTIFIED IN THIS CASE

While executing the arrest warrant, the police conducted a protective sweep, which, in and of itself, is perfectly legitimate. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990). During the protective sweep, the police observed, in plain view, several pieces of incriminating evidence. "The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Washington v. Chrisman*, 455 U.S. 1, 5-6 (1982). Thus, the preliminary question was whether the police had a "right to be" in Ms. Reynolds's apartment — such that they could lawfully conduct a protective sweep and legitimately seize plain-view evidence — and, as has been discussed, the majority and I reach different conclusions on that question.

The majority concludes that, despite the arrest warrant, we cannot condone a non-consensual entry because the police did not have sufficient reason to believe that Hardin was in the apartment, and, we cannot condone a consensual entry because the police obtained Hardin's consent improperly, through the use of a trick. Thus, the majority deems the entry unlawful and orders the

trial court to exclude the plain-view evidence seized during execution of the arrest warrant. As stated previously, I do not agree that the entry was unlawful, but that disagreement is irrelevant to the present discussion. That is, even if I did agree with the majority that the entry was unlawful, I would nonetheless disagree with the remedy. *See United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." (quotation marks and citations omitted)). The Supreme Court most recently explained its position on the exclusionary rule in *Hudson v. Michigan*:

> [E]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression. In this case, of course, the constitutional violation of an illegal manner of entry [i.e., the failure to knock and announce before entering to execute a search warrant] was not a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house. But even if the illegal entry here could be characterized as a but-for cause of discovering what was inside, we have never held that evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, but-for cause, or causation in the logical sense alone, can be too attenuated to justify exclusion. Even in the early days of the exclusionary rule, we declined to hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Hudson v. Michigan*, 547 U.S. 586, 591-92 (2006) (quotation marks, editorial marks, and citations omitted) ("Suppression of evidence [] has always been our last resort, not our first impulse.").

In the present case, whether their belief was reasonable or not, the police clearly believed that Malik Hardin was in Ms. Reynolds's apartment and that he was dangerous. In addition to requesting backup prior to executing the warrant, they sent the apartment complex manager, surreptitiously, into the apartment to confirm (or refute) their belief that Hardin was inside. The manager, acting at the officers' instruction, entered, identified Hardin, and departed (he did not search the premises or even report any plain view evidence). Two points are evident from the foregoing.

First, as police intrusions go, this is as limited and non-invasive as one could be. A no-knock entry would certainly have been more invasive. The police might have knocked and announced their presence, but that was neither prudent nor necessary in this case. *See United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("a no-knock entry is justified if police have a reasonable suspicion that knocking and announcing would be dangerous, futile, or destructive to the purposes of the investigation"). Or they might have conducted an exterior stake-out, in an attempt to confirm Hardin's presence before entering, but the Supreme Court has labeled this an equivalent intrusion. *See Segura v. United States*, 468 U.S. 796, 811 (1984) ("both an internal securing and a perimeter stakeout interfere to the same extent with the possessory interests of the owners"). As the Court explained in *Hudson*, "causation in the logical sense alone, can be too attenuated to justify exclusion," and:

> Attenuation can occur, of course, when the causal connection is remote. Attenuation also occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression

of the evidence obtained. The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve.

*Hudson*, 547 U.S. at 592-93 (quotation marks and citations omitted). I cannot say, based on the facts of this case, that suppression of this evidence furthers the objectives of the Fourth Amendment.

In addition, the Court's hypothesis in *Hudson* holds true here as well, in that: "[w]hether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house." *Id*. at 591. Certainly, the police could have done as the majority demands and further assured themselves that Hardin was actually in the apartment. They might have sought more specific information from the informant, questioned other residents using Hardin's photo, called the apartment and asked Hardin to identify himself on the phone, peered through the windows, or simply waited for him to emerge. And, having satisfactorily established his presence, they could have proceeded exactly as they did — they could have sent the manager in surreptitiously to determine Hardin's whereabouts within the apartment and followed that reconnaissance with a rapid and forceful entrance, executing the warrant, conducting a protective sweep, and eventually discovering the drugs and the guns. All that is to say that the manner by which they executed the arrest warrant had no bearing on the discovery of the evidence, and therefore, the Fourth Amendment violation — such as it is — is too attenuated to justify suppression of this evidence under these circumstances. *See id*. at 594.

## IV. CONCLUSION

For all of the forgoing reasons, I respectfully dissent from the majority's opinion.